ANDREW C. MAXWELL v. THE BAY CITY BRIDGE COMPANY.

*Injury to riparian property by proximity of bridge—Estoppel from claiming damages—Effect of legalizing statute upon existing right of action.*

A dock owner whose property is injured by the proximity of a bridge, is not estopped from claiming damages by the mere fact that his grantor had petitioned for the bridge, if the bridge company's action was not determined by the acts of the grantor.

The testimony of a witness as produced on direct and cross examination must be taken altogether.

An estoppel is not established if the evidence fails as to any essential element of it, but if there is more than a scintilla of evidence to establish it, the court will not inquire into its weight.

Where the Legislature legalizes rates of toll fixed by a board of supervisors for the use of a bridge previously erected without authority of law, the action of the two bodies precludes any question of the legality of the bridge thereafter.

An existing claim for damages arising from the establishment of an unauthorized bridge is not cut off by the action of the Legislature and the supervisors in merely recognizing the bridge as lawful, though no such claim can arise after their action.

Statutes do not operate retrospectively unless their language clearly shows that the Legislature meant them to.

The State cannot interfere with a riparian's profitable enjoyment of the shore without compensating him.

Whether the State can so legalize a bridge as to cut off pre-existing claims for injuries resulting from its maintenance—Q.

In an action for damages to a dock-owner resulting from the construction of a bridge near by which tended to prevent vessels from stopping at the dock, it is admissible for the plaintiff, after showing such interference, to give a general estimate of the annual damage caused him thereby; the defence can cross-examine him as to the particulars upon which the estimate was formed, and the weight of the evidence is for the jury, who should take it in connection with other facts in evidence.

In an action for actual damages the defendant's good faith has no bearing.

In an action for damages to property caused by neighboring structures, the fact that plaintiff has offered to lease part of the property to defendant has no proper bearing in the case.

Error to Bay. Submitted June 10. Decided June 22.

TRESPASS on the case. Plaintiff brings error. Reversed.

*Hanchett & Stark* and *Samuel Maxwell* for plaintiff in error. In an action for damages the weight of plaintiff's estimate of his damages is solely for a jury, if it is competent evidence: *Perrott v. Shearer* 17 Mich. 54; *Watkins v. Wallace* 19 Mich. 77; *Blackwood v. Brown* 32 Mich. 107; the owner of property injured by a neighboring structure is not estopped by the conduct of his grantor in permitting it to be erected, if it was built without reference to the grantor's conduct: Bigelow on Estoppel 473, 480, 560; Herman on Estoppel §§ 410, 411, 422; *Cronin v. Gore* 38 Mich. 385; *Howard v. Hudson* 2 El. & Bl. 1; *Copeland v. Copeland* 28 Me. 540; *Titus v. Morse* 40 Me. 352; *Otis v. Sill* 8 Barb. 108; *Welland Canal v. Hathaway* 8 Wend. 482; *Andrews v. Lyons* 11 Allen 349; *Turner v. Coffin* 12 Allen 401; *Boggs v. Merced Mining Co.* 14 Cal. 279; *Brant v. Virginia Coal Co.* 93 U. S. 326; *Smith v. Newton* 38 Ill. 236; *Zuchtmann v. Roberts* 109 Mass. 53; *Winegar v. Fowler* 82 N. Y. 315; *McMaster v. Ins. Co.* 55 N. Y. 229.

*Holmes, Collins & Stoddard* for defendant in error. The action of a Board of Supervisors in legalizing the rates of toll on a bridge built without authority, and of the Legislature confirming it, is enough to legalize the bridge from the date of its establishment: *People v. Maynard* 15 Mich. 471; *People v. Supervisors* 20 Mich. 95; *Attorney General v. Lothrop* 24 Mich. 235; *Pennsylvania v. Wheeling Bridge* 18 How. 421; *Clinton Bridge* 10 Wall. 454; *Kanawha v. Kanawha Coal Co.* 7 Blatchf. 391; *State v. Mississippi R. R. Co.* 20 Ark. 495; *Truckee v. Tahoe Turnpike Co.* 44 Cal. 89; *People v. Farnham* 35 Ill. 562; *Basshor v. Dressel* 34 Md. 503; *Atlantic &c. R. R. Co. v. St. Louis* 66 Mo. 228; *Black River &c., R. R. Co. v. Barnard* 31 Barb. 258; *People v. President* 9 Wend. 380; *White v. Ross* 4 Abb. App. Dec. 589; *Smith v. Harkins* 3 Iredell (N. C. Eq.) 613; *State v. Fourth N. H. Turnp.* 15 N. H.

162; *Trustees v. Zanesville* 9 Ohio 203; Cooley's Const. Lim. (4th ed.) 463, 471, 460–479; no private individual can complain of incidental damages occasioned by what the State has authorized: *Larkin v. County of Saginaw* 11 Mich. 88; *Maxwell v. Bridge Company* 41 Mich. 468; *Transportation Co. v. Chicago* 99 U. S. 645; *Chope v. D. & H. P. R. Co.* 37 Mich. 199; Cooley's Con. Lim. (4th ed.) pp. 481–487; the grantee of one who has licensed the building of a bridge abutting on his premises is estopped from claiming damages for injury resulting from its proximity to his property: *Swartz v. Swartz* 4 Penn. St. 353; *Cumberland Railroad v. McLanahan* 59 Penn. St. 23; *Sheffield v. Collier* 3 Kelley 82; *Cook v. Pridgen* 45 Geo. 331; *Lane v. Miller* 27 Ind. 534; *Russell v. Hubbard* 59 Ill. 335; *Wilson v. Chalfant* 15 Ohio 248; *Brown v. Bowen* 30 N. Y. 519; *Lee v. McLeod* 12 Nev. 280; *Beatty v. Gregory* 17 Iowa 114; *Raritan Water Co. v. Veghte* 21 N. J. Eq. 463; *Rhodes v. Otis* 33 Ala. 578; *Wynn v. Garland* 19 Ark. 23; *Richmond & Lex. Turnp. Co. v. Rogers* 1 Duvall (Ky.) 135; *Commissioners v. Withers* 29 Miss. 21; *Motz v. Detroit* 18 Mich. 495; *People v. Com. Council* 65 Barb. 10; *People v. Murray* 5 Hill 468; *Baker v. Braman* 6 Hill 47; *Embury v. Conner* 3 N. Y. 511; *Houston v. Wheeler* 52 N. Y. 641; *Burlington v. Gilbert* 31 Iowa 356: 7 Amer. 143; *Bidwell v. Pittsburgh* 85 Penn. St. 412: 27 Amer. 662; what one consents to and invites he cannot in law complain of as an injury: *Marq., Hought. & Ont. R. R. v. Spear* 44 Mich. 769; *Motz v. Detroit* 18 Mich. 495; one may waive by parol a constitutional provision for his benefit: Sedgwick Const. L. (2d ed.) 88; Cooley's Con. Lim. (4th ed.) 219; *People v. Murray* 5 Hill 468; *Baker v. Braman* 6 Hill 47; *Embury v. Conner* 3 N. Y. 511; *Houston v. Wheeler* 52 N. Y. 641; *Buel v. Trustees of Lockport* 3 N. Y. 197.

MARSTON, C. J.   This case has been before in this court, and is found reported in 41 Mich. 453, to which reference is made for a statement of the facts and a diagram, showing the location of the bridge, swing, property of the plaintiff, etc.

Two questions of primary importance have, with others, been argued and submitted in the present case, and these were not passed upon on the former hearing:

*First*, Did the evidence introduced tend to prove an estoppel as against the plaintiff or his grantor Hart, so that damages could not now be recovered against the company? and,

*Secondly*, Did the action of the supervisors in 1874, in fixing rates of toll for the bridge company to charge and collect, and of the Legislature in 1875 legalizing the rátes so fixed, legalize the bridge, and make it a lawful structure not only from the date when such act took effect, but from the time the bridge was established by the board of supervisors in May, 1864, as claimed by counsel for the bridge company?

The testimony of Mr. Glasby, who built the bridge, was one of the principal stockholders, and who testifies fully as to what Mr. Hart the plaintiff's grantor said and did in reference to the location and construction of the bridge and swing is given in a note herewith,* and there is no other

---

* *William F. Glasby*, sworn for the defendant, testified as follows: I reside in East Saginaw; have lived there since 1850. I am a contractor and builder. I built the bridge for the Bay City Bridge Company. I built the most of it in 1864. I owned about or very nearly one-half of the stock. I knew when the company was organized and the preliminary arrangements for locating and building the bridge. I knew Julius B. Hart; he had a store just north of the street where we were building the bridge at that time. I think it was the second store—a warehouse and store together. His was the second block; Park & McDowell had a liquor establishment in the first block. I believe I was acquainted with Mr. Hart before the bridge company was organized. When we were ready to locate the bridge I talked it over with all those interested in the neighborhood of the bridge, and Mr. Hart was among the rest, and I had a number of talks with him as to where he would like to have it located to suit him, with others. He seemed to want the location of the bridge there on Third street, where it was finally located. He was more active than other parties living right around there. He had nothing against it, but requested if there was any such thing he wanted it located there. He would be satisfied to have the bridge there, and wanted it there; that was his point for it. [Witness was shown a paper, being the petition of Hart and others herein set forth.] I recollect of there being a petition got up by the parties there which was requested by us bridge men to put before the board of supervisors and have their sanction in the thing as much as possible. I would not say how many times Mr. Hart and I talked over the matter, but did so every little while. There was some of them around every day talking it over. I could not tell you whether it was talked over five times or twenty times. We talked it

testimony in the case tending, more strongly than this, to
show acts or conduct of Hart, or reliance thereon by the
company, that would estop the plaintiff in this case.

In speaking of an estoppel, when this case was before con-
sidered it was said the doctrine of estoppel rests upon a
party having directly or indirectly made assertions, prom-
ises or assurances upon which another has acted, under such
circumstances that he would be seriously prejudiced if the
assertions were suffered to be disproved or the promises or
assurances to be withdrawn; and as the doctrine when
applied operates to take away legal rights it is no more than
common justice to require that the facts which are supposed
to call for its application shall be unquestionable, and the
wrong which is to be prevented be undoubted. The cor-
rectness and indeed the justice of the rule as thus laid down
will be unquestioned, sustained as it is by an almost
unbroken line of authorities. What is there in the evi-
dence to bring this case within the rule thus laid down?

The testimony of Mr. Glasby, when taken together, and
this is the only way to test it, shows conclusively, that in no·

---

over a number of different times. During the time I was building the
bridge I had a little office over Mr. Hart's store part of the time, and
part over in the next block below on this side of the street. Captain
Averill I think his name was. I saw Hart around frequently while we
were building the bridge every day or every day or so, and I could not
say how often.

*Question.* After the resolution had passed locating the bridge or giving
the consent to the building of it, state what you did and who assisted you
in making the actual locations and butments of the piers and swing?

*Answer.* The way I would explain that would be this: I wanted to
locate the bridge so it would be satisfactory to the people here as much
as possible, and I didn't care myself where it would be particularly, only
to suit everybody. All I can say in regard to Mr. Hart, his desire was
to have the bridge located on Third street and no other place. I recol-
lect something about the morning we went to drive the first spile. I drove
in the bridge proper through the channel of the river. I drove the spile
in the center of the swing as near as I could get at it, and it was talked
over that I was going to locate the swing, and there was different par-
ties there to look on to see how it would look, how far out, and so on. I
told them how far out I wanted it, and they didn't seem to know until
they could see a spile drove. There was all the neighbors, Mr. Hart and
all of them there looking on, and they made up their minds that it would
be about right. Mr. Hart was with the rest, and there was no objec-
tions, and said it would be about right. As near as I can recollect
there was no objections at all from anybody. I would say in
regard to the location, I believe it as I supposed to be just about
right for the use of the bridge, and the working of vessels and so

way was his conduct—and he then and for this purpose was the company—influenced or affected by the acts, conduct or language of Mr. Hart, different from what it would have been had Mr. Hart not been an actor or interested in the question at all. Mr. Glasby says clearly and distinctly that it was to the board of supervisors he looked and depended for his authority in the premises, in all that he did; that if his actions and doings pleased Hart, he (Glasby) was glad, but beyond this Hart's acts and conduct had no influence with him. It is clear beyond dispute from the evidence,

---

on through the bridge to be handy, the location of the dock at the time of it, we had to build a bridge about that shape to be so that it would not be knocked down right off. The swing of the bridge has to be about so far from the dock to be handy, and if it is too close it is in danger. I measured the depth of the water across the river, and then I talked it over with different parties here that knew all about the vessel business and the current up and · down the river here, and where there was a bar up above by Mr. Lord's mill as it used to be then. There was a bar out around there, and I wanted to get the channel as near as I could so as to have the long pier in the middle of the river with the channel of the river. I talked it over with different parties and put it to the best of my judgment of what I could make it by measuring the water above and below; in doing that I located it where it is. That was the best place I thought, or I should not have put it there. I am positive Mr. Hart was present when we drove the first spile, because all those were there that were interested. I drove the first as near as I could get at it, measuring from the shore to the center of the swing, as near the bridge line as I could. I drove the spile as near the center as I could, and from that spile I got my exact center; from that spile I struck out my stakes. I could not tell anything about how often Mr. Hart was around consulting with me while I was constructing the swing pier: it was frequently talked over with every one that came along. I could not say how many times I talked with Mr. Hart, nor anything about it. I did a number of times. We did all our shipping there, and I saw him very often; was in the store, and did a great deal of business with him. He had a shipping warehouse for steamboats, and all our iron we had came up and landed at his dock, and was unloaded there. We paid him, and he collected the bills that we paid him. I would say as to the influence of the thing in locating the swing pier, swing and abutments of the bridge where they are, I don't know as Hart had any great influence no more than general good will. I wanted every one to be satisfied, and he was perfectly satisfied with it, and had no objections to make, and seemed to be pleased when he talked it over. He, nor no other man that I know of, never expressed a word of objections or dissent to it. I don't know as his power, actions, requests and acts had any bad influence on us in relation to constructing the bridge and the expenditure of our money and nothing against it at all. I don't know as there was any great influence, no more than I was pleased to have him satisfied with it. It seemed to be his wish.

*Question.* Will you please state whether Mr. Hart was in a position where he saw the bridge during its construction?

Objected to by Mr. Hanchett. Objection overruled, and plaintiff excepted.

that aside from Hart's signature to the petition presented the board of supervisors asking that the bridge be located at the foot of Third street, he neither did any act nor said anything, which changed or influenced the conduct of the company, or upon which action was taken by it different from what it otherwise would have been, so that we are unable to see how it can now be said that the company relying upon what he said or did, expended any money or did anything, which justice and equity requires them to be protected in the full enjoyment of, as against Hart or his grantees. The

---

*Answer.* Yes, sir; he was where he could see it every day, and his store was right in plain view. I presume he was attending to his own business at the store. He was there, and I saw him around. I could not tell how often I did see him during the progress of the work; I might have seen him once a day, and I might have seen him 20 times a day, and might not see him once in a week. I didn't notice whether he was there every day or not. His position was where he could see me a dozen times a day, just as well as not, if he was at home. I cannot say whether he was there every day or not. He might have been out of town a day or so, and I not know it. He was there generally just as much as any other man doing business in his own store. I would see him very often. There was never a word of complaint in the world in no way, shape, or manner from him. He didn't disapprove of it in any way, shape, or manner; that is all he could do about it. I didn't ask him to help me, or any such thing. I could not tell the date of the application to the board of supervisors, yet I remember the whole transaction. I had a little sketch of the plan of the bridge, something of what I was going to build. I had a plan something like the manner of the construction of the bridge. I have got the most of that plan. I have got the plan just as we built it, with the exception of from the swing this way. I cut off that part of it, and used it in another draft and I have not got that 50 feet of the light trestle-work that was on this side; I used it up. [Witness produces the plan.] This was the plan that I presented to the board of supervisors. It shows a part of the swing that we built there, but it don't show so that you can tell from the shore, on account of the first 50 feet being cut off. There was 50 feet of trestle-work, running from the end of the swing to the dock, that I cut off and used in another place. This place represents the end of the swing. There was a 50-foot span just exactly like this other 50-foot span run to the dock. He saw that, and we showed it to every one. Mr. Hart saw it a number of times. The bridge was built after this plan—exactly like it. It was either that or tracing of it that was before the board of supervisors when the petition was presented; if it was not that identical paper, it was a tracing of it. I mean we traced it off on tracing cloth, a copy of it. There was no other draft of it ever got up, and that is exactly the way we built the bridge. This plan indicates what parts are wood and what parts are iron.

The draft offered and received in evidence, and marked exhibit "C."

*Question.* [Showing witness paper, being the notice attached to the petition.] Will you look at that notice?

*Answer.* I have seen that notice lots of times. I think I posted that notice. I done it myself, individually, because I wanted it done to suit me, and I done it the whole length of the Saginaw river, from Salina to the lake. I cannot tell the exact stump or house where I posted them.

essential elements required by the doctrine of estoppel in order to apply it are wholly wanting in the present case. Were this simply a question as to the weight of the testimony, within the rule laid down in *Conely v. McDonald* 40 Mich. 150, and since adhered to, we should not interfere, but in our opinion the evidence failed in essential particulars to establish an estoppel, or facts which would warrant a jury in so finding.

Upon the second question we are of opinion that the acts of the supervisors and of the Legislature in fixing and legal-

I knew what the law required in regard to the number of towns that notices must be posted in, and I knew the towns then and looked them all over, and went and did it myself to have it correct. I could not tell the exact house or stump where I posted them. I can explain what knowledge I had of what I had to do, and what means I took of ascertaining what had to be done on posting the notices in this way. I helped to get up the charter of the East Town bridge; two charters up to East Town, and I knew what I would have to do, because when I got up those others I looked it all over, and I knew; and I came down here knowing just what I had to do a year before. [Witness was shown statute to refresh his memory.] The law required so many days, and I testified that I posted them in the required time. I was very particular about that. It wanted three weeks, and I say I did it four or five weeks before. I won't say it was three days over, but I was particular having it right. I don't recollect the particular places in each town. They were posted up in just as public places as I could find. But I could tell the greater part of them where I put them up. It was over three weeks. I will testify to that sure, because I am positive about it. It is a pretty hard thing to tell the exact place I posted them at, around town here. I know I had one stuck up near the Barclay house here—I forgot whether it was on the house or exactly the spot; and I stuck up one on the old Stephens store up there; and up at East Town I stuck up some there, in the town, in the most public places I could think of—anywhere it came handy. I remember of going to Salina, and putting them up there, and over to Saginaw City. I could not tell all where I put them, only I know I kept up the required amount, and I done it in time. I would swear to that anywheres. At that time I knew exactly the different townships, but I could not tell now. I posted notices in each of the townships on the Saginaw river—I was particular about that. It was more than three weeks prior to the meeting. I don't know whether Mr. Hart was present or not at the meeting of the board of supervisors at the time this question came up. I posted three notices in each town, and I think I posted in some places a number more than that. I got a lot struck off, and I stuck them up where it came handy. I would not say positively that at the time of the meeting of the board of supervisors, or the presentation of the petition, I furnished proof to the board of such posting, but I think I did. I have no doubt about it at all, and if it was asked or any question about I done it. I don't recollect that particularly. The bridge first cost us very nearly $28,000. I've built it partly since. I built the iron contract here, and had something to do with the rest. We calculated to get it as near the same line of the old one as we could. We put it on the same line as near as we could mark it. I think it is on the same line. It was the same width in the roadway—exact.

izing the rates of toll upon this bridge were such that the public could not thereafter question the legality of the structure or the right of the company to maintain it under its charter. We are also however of opinion that such action would not cure or cut off any claim which up to that time the plaintiff may have had, because of its illegal character and the injury he may have sustained in consequence thereof. The Legislature did not attempt to legalize the action of the board of supervisors in granting authority to construct the bridge in 1864, even if such an

---

CROSS-EXAMINATION BY MR. HANCHETT.

I cannot exactly tell now the date when the Bay City Bridge Company was organized. I was not one of the original corporators. My connection with it was from the beginning. I virtually owned the stock from the commencement. That was the agreement. I was to own the bridge, and yet, in a business way, there would have to be a good deal of security in all of such works to get the thing along, and I proposed to run the thing myself. I did not want to get outsiders interested. I had those three men take the stock. I came up as a contractor and took the bridge. In fact I had an old man that worked for me by the name of Brown that took the contract, so I went security for the whole of them all round. Then I owned the stock virtually myself. William S. Gilbert and myself owned the stock, and I was a stockholder. The stock had been transferred to me after the organization of the bridge company, so that from the beginning I was the managing man. I was the one that first came down here to look it over and talk about the bridge, and get the rest to take hold with me. I did, by the way of William S. Gilbert, institute the proceedings to get the authority from the board. I was the one that instigated this job down here. The company was formed for the purpose of building this bridge and no other. I had already been connected with the foundation of two other bridge companies. I had built one bridge across the river at East Town the year before, so that I knew that the authority to build a bridge across the river must come from the board of supervisors. I did not write the petition that was presented to the board of supervisors for authority, but I knew what was done, and how it was being done. I think Mr. Gilbert presented the petition. I did not present the plan of the bridge to the board myself. I think Mr. Gilbert did it. I was not before the board to say anything or to do anything. I was down here backwards and forwards. I was here once or twice while they were in session, but I think I was not here the day they acted on the application. I was here when they were talking over once about the tolls; I think that's all. When I say that plan was presented to the board, I am speaking of what I understood from Mr. Gilbert, and those down at this end of the river. I went along the river myself to select a place to locate it. I think Mr. Gilbert was not with me; I think I had a man with me that I brought down here that surveyed the river and staked it. His name was Bush. I employed him, and I think we went about up to Mr. Lord's mill, and I think I was out on the ice and cut holes in it, and measured across the river every 50 feet, so that I acquainted myself with the whole space as far as I wanted to go. I did not calculate to build the bridge any further up or down than that. I talked with different parties right around Third street, and consulted with the citizens here in

act in 1875 would cut off the right of the plaintiff to recover damages which he had sustained between those dates. The act of the supervisors in 1874 in fixing tolls thereafter to be collected and the Legislature in making legal such proceedings of the board, was but a recognition of the legality of the company and its rights after that date. Statutes are not to be given a retrospective construction unless the language thereof shows clearly such to have been the intention of the Legislature, and in this case it clearly appears that no such intention existed, but that other and far different reasons

---

the city in regard to the location of the bridge. That is in the winter of '63, about 16 years ago. I heard Mr. Hart is dead now. When I speak of Mr. Hart and his conduct particularly, I haven't a bit more recollection of what he said and did than what other people said and did on the subject. He had a good deal to say about it because he was anxious, and so were others. He was in the neighborhood, and I could see him every day, or very frequently, and just so with all the rest that lived there. In regard to Mr. Hart's conduct, it is no different with him than a Mr. Barclay on the other side of the street. I was desirous and satisfied to have other people satisfied. In my location of the bridge I looked to the board of supervisors, and depended upon them for my authority. I did not look to the people for that, of course. When I constructed the bridge I looked to the board for my authority, and acted in obedience to that authority as I understood it. That's what I supposed I was doing and intended to do. In regard to Mr. Hart's conduct, I can simply say I was glad he was pleased at what we were doing. After we had got it all round in shape, and the supervisors satisfied, then I showed him what I was going to do, and they were all satisfied. When I drove that spile at the center of the swing, I can't exactly tell whether Mr. Hart was there before or after it was driven, but they all had a good deal to say about my business that morning, and they were all there looking on out of curiosity, and every one had his opinion as to whether it was too far out or in. I drove it just where I had a mind to, and they were all satisfied with it. When I started the pier I acted exactly as I was a mind to, and nobody dissented. They thought it was all right; I thought it was all right, and, says I, how is that? and they says that is exactly the spot. In putting it there I acted on my own judgment, and under the authority I got from the board. I was satisfied first, and if they were satisfied afterwards, I was glad of it, and I went on building the bridge clear through in the same way. They thought if I had a mind to come down here and fool away my money, they were pleased over it. I thought it would come out all right; I acted upon my own judgment, and in putting the bridge there and locating it there, and constructing it as I did, I did it under the authority of the board, and I looked to the board only, of course, for my authority. I could not get any sanction from the citizens here to build the bridge, no more than their will for it. I was glad if they were suited. I could not say any particular thing that Mr. Hart said on a particular day, only I know he never growled about it more than the rest. As I did my work along step by step, when I saw Mr. Hart with others I have spoken of, I called their attention to it, and as questions came up, and I asked whether they were pleased and they said they were. They found no fault only to hurry up with it.

existed for the action of the Legislature. We need not therefore discuss at length in this case, what the effect of an act legalizing the structure from 1864 would have been or how the plaintiff might have been affected thereby. This case calls for no such investigation.

But conceding that the effect of the legislation of 1875 in legalizing the previous action of the board of supervisors was to make the bridge and pier a lawful structure, it does not follow that the plaintiff may not maintain an action for the consequential injury to his dock. Neither the super-

---

#### RE-DIRECT EXAMINATION BY MR. HOLMES.

There was no general controversy between the citizens in regard to the location of the bridge, as I know of. There was some different parties that said they wished it could be put up at the foot of Center street. In regard to the necessity of the pier being built the length it was, I would say when I built the bridge it was before the days of tugs; vessels most all sailed up here, and I wanted to get the pier down below the bridge, so that if a vessel came up it would strike that pier before it would strike the bridge. I built it down a considerable ways on that account, and sharpened it off, and built it down farther than it might be now probably when they tug vessels through and scows and everything as handled by the tugs. Then there was scarcely a tug on the river, and vessels would come flying up through here, and I had to have a protection above and below, in order to protect it. Without this they would come up part way, and throw their anchor out, and swing right in the bridge, and I had to have a protection there. I think I put that 25 or 50 feet below the end of the swing, when the swing is open. It commenced right where the swing comes around below; I commenced and sharpened it off so as to give it a sharp point. The length is just exact as I thought about right at that time. If I was going to build one now, I would build it exactly like it, if I could.

#### RE-CROSS-EXAMINATION BY MR. MAXWELL.

There has been tugs on the river a good while, but there was not so many then; vessels sailed up then. I wanted to go down as far as could without any complaint, and there would no one have complained if I had gone down 10 rods further. I did not drive that group of spiles at the end of the pier. I planked up all I drove. It has been 12 or 14 years since they commenced tugging, and don't sail up so much. They don't sail up very much now, but they used to. I don't know as any of them sail at all in the neighborhood of the bridge.

And said witness being further examined by defendant's counsel testified: We did not complete the bridge entirely until along in the spring of 1865,—that is, to get the sidewalks and everything all done. Boats were running when I got the sidewalk completed. I commenced the work in June, 1864, and I think I had it done along some time in April, 1865. We had a freshet that bothered us, and I worked right along; and there was some little work about it that I done along in the spring, but we had the bridge already to cross when the ice started out. It was substantially by the fall so that we could travel. The ice was good until I had the bridge ready to travel.

visors nor the State can directly or indirectly appropriate the plaintiff's use of the shore to public uses without compensation; and if even a lawful bridge and pier is constructed so near it as to preclude its profitable use he is entitled to compensation. If the bridge and pier is far enough from the dock so that it may be used but only with inconvenience, the same principle applies, and the question is merely of the extent of the injury.

On the part of the plaintiff testimony had been introduced tending to show that certain vessels had not stopped at his dock because of this bridge, which otherwise would have, and the business lost in consequence thereof. The plaintiff was, as a witness, then asked: "What in your judgment has been the diminution in your business in amount by this prevention or interference with the boats coming there?" *Answer.* "About a thousand dollars a year during the years 1873-4-5-6." The court in charging the jury upon this subject said that such general statement or estimate of damages was not enough for the jury to consider; that it devolved upon the plaintiff, especially if defendants acted in good faith, to show in some satisfactory way a safe basis from which they could determine the amount of his loss or injury. This evidence, following what had then been introduced, was admissible, and the particulars upon which such estimate was formed could be called out by the other side. The estimate for the purpose for which it was introduced was competent, and the weight thereof was for the jury. If the court desired the jury to understand that while they could consider such estimate of damages, yet that it was not conclusive, but that the facts and circumstances previously testified to should be considered in connection therewith, by them, in estimating the damages, then the charge would have been correct to that extent. It was competent testimony to be considered by them, but under the issue and claim of the plaintiff, the good or bad faith of the defendant had nothing to do with the question. Only actual damages were claimed, and the good or bad faith could have no bearing upon that question.

The fact that the plaintiff offered to lease some of the prop-

erty to the defendant had no proper bearing in the case, and should not have been considered.

The judgment must be reversed with costs and a new trial ordered.

The other Justices concurred.