## SHEFFIELD CAR CO. v. CONSTANTINE HYDRAULIC CO.

1. EQUITY—PARTIES—WATERS AND WATERCOURSES—MORTGAGES—BONDHOLDERS AS NECESSARY PARTIES—TRUSTS.

In a suit to enjoin a corporation from maintaining its dam at increased height and to restrain defendant from interfering by its dam with the water rights of complainant, the trustee under a mortgage executed by defendant corporation including its power dam and accessory and appurtenant rights but not covering land or easements affected by the additional flowage caused by the increased height of the dam, was not a necessary party so as to require the court to dismiss complainant's bill on objection raised at the hearing; the trustee not being in possession or participating in any unlawful acts of defendant.

2. SAME—PRACTICE—PLEA.

While the defect of parties was not open to demurrer, the facts necessary to raise the objection might appropriately have been presented by plea.

3. SAME—POSSESSION.

Such proceeding might be sustained as to a mortgagee defend-

ant in possession continuing an unlawful obstruction of the stream.

4. ESTOPPEL—WATERS AND WATERCOURSES—DAMS—EASEMENTS.
Complainant, being the owner of water power rights and of a dam across the St. Joseph river, purchased further rights of a certain paper mill during 1905 and thereby became sole owner of the power. Defendant, a corporation having a dam of eight feet in height below complainant's, began in 1902 to raise the structure to a height which would interfere with the rights last acquired by complainant of the paper mill, if the water should be dammed back to its full height. The proprietors of the paper mill rights made no objection to the proposed increase in the height of the lower dam, but waited to ascertain whether in the use of the water defendant would injure their interests. After the new dam was completed defendant so dammed the water as to interfere with the power of the paper mill, and with complainant's previously acquired rights. Defendant claimed to have expended large sums of money in raising its dam, and that complainant was estopped by failure to protest, although it appeared by the testimony that after defendant had set back the water in the river by using the addition to its dam, complainant had objected. *Held*, that complainant was not estopped, the facts being equally apparent to both parties, and defendant having proceeded on the theory that it did not expect to so employ the power rights as to dam the water back to complainant's property: also that the result could only be accurately determined from the practical use of the new dam.

5. SAME—RELIANCE—DUTY TO SPEAK.
Both parties having knowledge of the facts or equal facilities for ascertaining the truth, no estoppel could arise.

6. SAME—ACQUIESCENCE—KNOWLEDGE.
As a general rule, if a person having a right, and seeing another person about to commit some infringement upon the right, stands by in such a manner as to induce the wrongdoer, who might otherwise desist, to believe that he assents to its being done, he cannot afterwards be heard to complain: assent may be inferred from his acquiescence.

7. SAME.
An equitable estoppel *in pais* requires, as to the person against whom the estoppel is claimed, duty to speak, an opportunity therefor, failure to speak and reliance in good faith on such failure.

8. Same—Necessity—Equity.

Nor did defendant's evidence establish the claim that the inconvenience that would result from granting the relief asked for would be disproportionately greater than the benefit to complainant, so that equity ought to refuse its aid.

9. Waters and Watercourses—Decree—Injunction.

In entering a decree restraining defendant from raising the water above the level of its original dam, the lower court erred, as defendant had a right to use the full head of water which it would enjoy with the use of the former structure: the decree should have determined the depth of the natural flow at the dam as it originally stood.

10. Same.

*Held,* that the damages awarded were not excessive.

Appeal from St. Joseph; Yaple, J. Submitted April 4, 1912. (Docket No. 27.) Decided July 22, 1912.

Bill by the Sheffield Car Company against the Constantine Hydraulic Company for an injunction and other relief. From a decree for complainant, defendant appeals. Modified and affirmed.

*B. E. & E. H. Andrews* and *M. L. Howell,* for complainant.

*H. O. Bliss, F. W. Knowlen,* and *Frank H. Scott,* for defendant.

Stone, J. The bill of complaint in this cause was filed to restrain the defendant from backing water, by means of a dam, across the St. Joseph river at Constantine, upon the property of the complainant at Three Rivers.

The bill states: That complainant was incorporated under the laws of this State in June, 1882, for the purpose, among other things, of manufacturing cars and railway supplies at Three Rivers, and that it was authorized to acquire, own, and operate water power for its corporate purposes. That some time prior to the year 1860 a dam was constructed across the St. Joseph river at Three Rivers, under legislative permission and authority, and

that the parties so constructing said dam acquired title to a considerable quantity of land adjoining the races leading from said dam, and held the same for use in connection with said water power, and sold the same from time to time in parcels, with certain of said water power appurtenant thereto, so that at the time of complainant's incorporation said lands and water power were held and owned in severalty by a number of individuals and corporations, and was then being used for various manufacturing purposes at different factories located on several races, and at considerable distance apart. That said dam so constructed had a height of about 8 feet, and the power produced by the water ponded thereby was equivalent at said dam of substantially 800 horse power, or 100 horse power for each foot of fall. That the races leading from said dam entered the river below the dam at different points, and at varying distances from the dam; the lower one carrying water sufficient for from 400 to 500 horse power, under an 8-foot head emptying into the river through the tailrace of what is known as the "Paper Mill," at a distance of upwards of three-quarters of a mile from said dam, and having at that point a fall of over 12 feet from the top of the dam, while the other races nearer to said dam had a fall of from 8 to 9 feet, so that a given quantity of water was very much more valuable at the lower race, or paper mill, than it was at either of the other factories at said dam. That the water so ponded was used at said several sites for more than 35 years prior to 1902, without any interference by backwater, and without any question or claim adverse thereto by any person. That the business of complainant increased, so that it required additional power for its operations, and about the year 1888 it began buying the same of the other owners, as it could, and about the 1st of August, 1905, it became the owner of all of said power. That the said power so purchased by it had been in use undiminished by backwater for more than 35 years, and that upon the purchase of any of such power, as aforesaid, complainant immediately entered

into possession thereof, and ever since has held and used the same. That complainant, for each of the several interests in said water power, paid a large sum of money aggregating more than $40,000, and after the purchase thereof, it expended more than $10,000 in reconstructing and repairing said dam. That it has from time to time improved the factories purchased by it, as well as the original factory, and has invested therein, and in the machines and fixtures appurtenant thereto and used therein, more than $250,000, and that it has in its employ over 700 persons, and its annual business exceeds the sum of $1,000,000.

That in order to operate successfully it requires the use of the entire water power that can, by proper construction and arrangement, be secured from said dam, and any loss thereof will necessitate the reduction of its force of employés and prevent the full operation of its entire plant. That because of the very considerable fall between the dam and the said paper mill tailrace the water that can be used at that place is at least 50 per cent. more effective in the production of power than it would be at the dam, and the wrong and injury hereinafter set forth is proportionately greater at said paper mill tailrace than at any other point, so that, while complainant might otherwise construct a power house on said tailrace, in which all the water ponded by said dam could be used, and thereby produce 1,200 horse power instead of 800, nevertheless, if the defendant be not restrained from backing water into said tailrace, as hereinafter stated, not only will the concentration of such power at that point be rendered impracticable, but also the accustomed use of said paper mill power will be prevented, and the value of said paper mill property will be seriously lessened. That the use of said power is worth in the market at least $25 per horse power per annum, and because of the situation of complainant's property and the arrangement of its machinery it is worth to it very much more, and a loss of even a small part thereof would require a rebalancing of all the departments

in its works and a material reduction of its employés and output. That the cost of operating an auxiliary steam plant for supplying the power lost by the backwater, hereinafter mentioned, would be at least four times as much as the cost of the water power so lost, besides the cost of installing such steam plant. That it is the undisputed owner of all of said power created by said dam, and of all the races, flumes, real estate, easements, and privileges, necessary to the full enjoyment thereof, and is entitled to discharge the water from its several wheels through its tailrace back into said river, without interference or obstruction by any other dam, or by any backwater caused by any obstruction erected in said river by any person or corporation, and that its grantors have exercised such right and all other rights pertaining to absolute, unincumbered ownership of said water power for more than 40 years; and complainant has, in reliance upon such ownership and such rights, invested in and about the purchase, improvements, and betterments of such water power and appurtenant property, and in and about its machinery to be operated thereby, and its material, trade fixtures, and business dependent upon such rights and titles, more than $350,000.

That on or about the 10th day of February, 1868, a corporation under the name of the Constantine Hydraulic Company, was formed under Act No. 411 of the Laws of 1867 of this State; and that the stated purpose of such corporation in its articles was the construction of a dam across the St. Joseph river at Constantine. That shortly after the organization of said defendant it constructed a dam across said river at Constantine of a total height of about eight feet; and that the water was thereby ponded and set back to a point a short distance below the said paper mill tailrace. That no other or further authority for the construction or maintenance of said dam was ever obtained by defendant than the said act of the legislature. That about December 7, 1897, said defendant assumed and attempted to renew its corporate existence for 30 years

from January 20, 1898, but whether it is an authorized corporation, or whether it has any rights or powers under such claimed renewal, complainant is unable to say; but it avers that by the terms of section 2 of the act aforesaid it was forbidden to pond the water back upon the said properties at Three Rivers, to their injury. That after the purchase by complainant of the said Three Rivers Paper Mill property and power the defendant, without any right, and without any permission from the board of supervisors, and without any notice to complainant, began increasing the height of its said dam, and from time to time added to it, until it was made 11 feet or more high. That some time during the year 1905 the defendant, having completed the raising of its dam, began ponding the water to the full height thereof, thereby backing the same into the tailrace of said paper mill property to the depth of more than three feet, and backing the water into each and all of the other tailraces of complainant, thereby reducing the head of water at such other properties more than two feet at those next above the said paper mill property, and more than one foot at the factory nearest the dam, so that in the aggregate complainant is, by the unlawful backing of said water, deprived of more than one-fifth of its power, the rental of which is at least $7,000 per annum; and that up to the time of the filing of this bill complainant had been damaged and injured more than $5,000.

The bill prays that the defendant may be forever restrained and enjoined from setting back the water into the said tailraces, and from decreasing the head of water to which complainant is entitled by backwater; that said dam at Constantine, so erected and maintained by said defendant, may be reduced to the height of eight feet; and that said defendant may be decreed and required to pay complainant all damages and loss sustained by it theretofore and thereafter, until the making of said decree, resulting from so unlawfully backing said water upon complainant's property.

The original answer of defendant leaves complainant to its proofs as to many allegations of the bill. It admits its organization under the act named and amendments thereto, and avers that it had a legal' right to organize under said act to carry out the purposes stated in the articles of said association, and avers that the legality and regularity of its organization cannot be questioned by complainant. It avers that its existing dam on and across St. Joseph river at the village of Constantine was erected during the year 1873, and ever since has been maintained substantially at the height of eight feet above the stage of water of said river on the 12th day of January, 1872, as determined by a mark upon an abutment of the St. Joseph river bridge at said village of Constantine; but it denies that the dam so originally constructed backed water to a short distance below the said paper mill tailrace. It admits the renewal of its corporate existence, and avers that the question of its organization can only be raised by the State of Michigan; and the same is true as to whether it got permission from the board of supervisors. It admits that it raised its dam from time to time, which it had a perfect right to do, and that the complainant had full knowledge of the fact at the time the same was being raised, and made no protest or objection thereto, although the defendant was expending large sums of money in the work of raising said dam. It denies that the dam was raised to the height of 11 feet, or, in fact, to any height that can in any way injure complainant. It denies that its dam backs water in any of the tailraces in any way whatsoever. It denies that it is the sole cause of, or even that it contributes in any way to, the injury complained of.

By way of cross-bill, the defendant claims that the complainant holds the water back in its pond to the extent of 50 per cent., to the injury of defendant, and to its damage, up to that date, of $8,000, and it prays that complainant may be perpetually enjoined from holding said water back, as before stated; and that complainant may be de-

creed to pay its damages for loss sustained. The complainant answered the cross-bill by general denial.

Before the hearing defendant filed amendments to its original answer, in which it claimed that its dam, as originally constructed in the year 1873, was as high as its dam was after the additions made in the year 1905, which are complained of; that said dam, as originally constructed, backed up the water in said river as far as the dam backed said water at the time the bill of complaint was filed, and had done so continuously ever since the dam was first erected, and that defendant had so backed the water during such entire period openly, notoriously, adversely, and under an undisputed claim of right; and that defendant had thereby acquired the absolute right to so back said water; that said dam had settled since originally erected, and that such settling had been much greater at some points than at others, and that additions had been made to said dam at several different times prior to the year 1905, for the purpose of restoring the original height thereof and making the crests thereof level; that the addition made to said dam in the year 1905, which is complained of in the bill, was made for the same purpose, and that at no time was said dam made higher than when originally erected; that if, as matter of fact, any water was backed into the so-called paper mill tailrace at Three Rivers (all of which was denied by defendant) the same did not result from the dam of the defendant, or from any act or negligence of defendant, but was backed therein, if at all, because said tailrace, during a period of 15 years next preceding the commencement of this suit, had been deepened from time to time, until the bottom of said tailrace was much lower than the bed of the river at the point where said tailrace emptied into said river, and because the bed of said river below said tailrace had been gradually and continuously filling with débris, earthy deposits, vegetation, and other things, which have tended to retard the flow of said river, and because of other conditions over which defendant had no control.

Pending the hearing in said cause, defendant filed a further amended answer, in which it substantially claimed: That early in the year 1902 it conceived the plan of utilizing the power available at its said dam to a much greater extent than it had theretofore utilized the same by construction of a hydro-electric plant, to be operated by said water power, with a view to supplying electric lighting to cities and towns, for public streets, and also furnishing light and power to private consumers thereof in towns and cities in the vicinity thereof. That the construction of such a plant and necessary transmission and distributing systems involved a very large expense, not warranted by the amount of power that could be developed at said point by said dam at the height at which it then stood; and that in order to develop sufficient power at said dam to return a reasonable profit upon the said necessary new investment in said plant, said dam would require to be raised not less than 30 inches above its then existing level. That thereupon, in order to determine whether or not this defendant would be able to lawfully raise said dam to said increased height, it employed one Fremont Hill and one C. E. Bennett, civil engineers, reputed to be, and as this defendant believed, skilled in hydraulic engineering, and competent, for the purposes of said employment, to survey said St. Joseph river above said dam, in order to ascertain what land would be overflowed in the event that said dam should be raised to said additional height. That said Hill and said Bennett did, on or about June 30, 1902, report that they had surveyed said river, and that such addition would not cause any backwater above a bridge, known as Drumheller's bridge, which was 1¼ miles below the mouth of said paper mill tailrace; and said engineers submitted and gave to this defendant a map purporting to show, and which they assured the defendant did show, all the land which would be to any extent overflowed by reason of said addition to said dam, which was as above stated; and that said engineers reported to the defendant that it could safely raise said

dam one foot higher than said 30 inches proposed to be added, without backing any water into or upon said tailrace. That, believing said report of its engineers to be true and relying thereon, it determined to carry out said plan; and it therefore settled and paid for such flowage rights as were required, as shown by said reports and said map, and believed that it had thereby acquired the right to flow all the lands which would be affected by said backwater.

That this defendant entered upon the carrying out of said plan on or about the 1st of July, 1902, and thereafter expended more than the sum of $218,000, in said work, none of which moneys would have been expended by it, had it not believed that it had the right to raise said dam, as aforesaid. That it built a large power house of brick and stone near the site of said dam, and equipped the same with water wheels, generators, and other machinery necessary to be used in the developing and distributing of said power, and connected said dam and said power house by a race. That in September, 1902, it began to raise said dam about 30 inches above the crest of the dam as same had existed immediately before said work was entered upon, and completed the raising thereof half way across the said dam, extending from the west abutment to the middle thereof, on or about the month of October, 1902. That all the work above described was completed about the first day of July, 1903; and that the larger portion of the said expense was incurred during the year 1902. That on or about the 22d of May, 1905, it began the work of completing said addition to said dam, and did complete the same on or about the 17th of June, 1905. That it entered into a lighting contract with the city of Three Rivers for the lighting of the streets of said city; and to enable it to carry out said contract it built and equipped a transmission line from Constantine to Three Rivers, said line being about eight miles in length, and erected a system of poles, wires, and connections in said

171 MICH.—28.

city, which transmission line and system it has continuously maintained, and then was so maintaining and operating. That its contract with said city of Three Rivers was still in force, and that it was then lighting the streets of said city by electric light generated at said plant, and that it then was and had been for upwards of five years also lighting by electricity generated at said plant the streets of Constantine under a contract with the last named city, which is still in force; and that it likewise owns and maintains, and has continuously owned and maintained for five years, a system of poles, wires, and connections sufficient to distribute light and power throughout the said city of Constantine. That it has negotiated with other cities for the lighting of their streets from said plant, and expects to be able to procure contracts with and to light streets of other cities, as well as those named, if not deprived of the full use of its said power by order of the court. That, in addition, it has contracts with a large number of private consumers, by virtue of which it is supplying electric lighting to residences, stores, and other places, and electric power to manufacture, all of which are of great value to it. That it did all the things herein recited relying on, and because of its belief, that it had the right to so raise and maintain said dam; and that the power that could have been developed at said dam, if the same had not been so raised, or that can be developed in case the same is lowered, or the right to the use thereof limited, as prayed in said bill, would not have justified the investment of said moneys, and that no part thereof would have been so invested.

That neither said complainant nor its predecessor in title to the said paper mill property, although they had full knowledge, before the erection of said plant and raising of said dam, of the defendant's intention to erect said plant, and so raise said dam, and of every step taken by defendant, and of its large expenditure of money in the premises, and that defendant believed that the raising of said dam would not cause backwater above said Drum-

heller's bridge, either objected to or protested against said acts of defendant; but, on the contrary thereof, the Three Rivers Paper Company (from whom said complainant acquired its title to said paper mill property), in September, 1902, and before defendant began the work aforesaid, believed and claimed that the proposed addition to the height of said dam would cause water to back into said tailrace, and, without giving defendant any notice of such belief or claim, or of its actions as hereinafter recited, caused a surveyor to make bench marks at defendant's said dam, and at various places upon said St. Joseph river, and caused observations to be made of the levels of the surface of said river by said surveyor and others from time to time, for the purpose of gathering evidence to be used against defendant in a suit for injunction against the maintenance of said dam, which said Three Rivers Paper Company had already, in said year 1902, determined to bring against the defendant when said dam should be fully completed.   That said Three Rivers Paper Company sold said Paper Mill Company property to said complainant on or about the 12th day of November, 1904, and before such sale informed said complainant of its said claim and belief that said addition to said dam would back water into said tailrace, and that the raising of said dam one-half its width had already backed water into said tailrace, and of all that it had done in September, 1902, and thereafter, in collecting evidence to be used in such proposed suit for an injunction.

That at and before the time of its said purchase, the complainant knew of all the acts, doings, and expenditures of this defendant in the premises, as herein set forth, and of the belief of this defendant that the addition to said dam would not back water into said tailrace.   But complainant gave no notice to defendant of its said belief and claim, and permitted defendant to complete said dam without objection.   That the failure of said complainant to give such notice was in pursuance of a deliberate purpose entertained by said complainant, at and before the

said purchase by it, to remain silent, so far as the defendant was concerned, in regard to its said claim and belief, and to permit this defendant to complete said dam, and, when the same should have been completed, to bring an action for an injunction to compel defendant to remove said addition to said dam; and to that end the complainant caused observations to be made of said river from time to time by persons hired by it for that purpose, to be used as evidence in said proposed suit. And that defendant had no knowledge of any such claim on the part of the complainant, or of its predecessor in title, until after said plant and addition to said dam were completed, whereupon said complainant served notice upon it to lower the said dam. And that to have lowered said dam at the time it received said notice would have been, and it would then be, ruinous to defendant. That in the erection of said plant and raising of said dam defendant incurred a heavy indebtedness for borrowed money, and after said plant was erected and had been in operation for about three years, without objection or protest from complainant, and after the said dam had been fully completed, and before any notice of any claim of complainant, in order to raise money to pay said indebtedness, it issued and sold its first mortgage bonds to the number of 250 of the par value of $1,000 each, dated April 1, 1905, bearing interest at the rate of 5 per cent. per annum, and payable April 1, 1925, and that all of said bonds then were, and were at the time of the serving said notice and of the bringing of this suit, outstanding and unpaid. That said bonds were secured by deed of trust of even date therewith, executed by defendant to the Royal Trust Company and H. E. Ambler, as trustees, of Chicago, conveying the said dam and hydro-electric plant, machinery, transmission line, and flowage rights, and that the same constitutes the only security for said bonds. That until after the beginning of this suit, and after the filing of the original answer herein, defendant believed that said addition to said dam did not cause any water to back into said tailrace, but that it now

believes that the water is caused thereby to back into said tailrace to some slight extent. That it has at all times been willing to pay, and expected to pay, all persons affected thereby reasonable compensation for all damages so suffered, and until after the beginning of this suit believed that it had done so. That it is now ready and willing to pay such damage, if any, as it may appear that complainant is entitled to. But it says that such damage, if any, is slight, and is very small compared to the loss which defendant would suffer, if compelled to lower its dam, or if limited in the full use thereof. And that complainant, having purchased said paper mill property under the circumstances, and with the knowledge, hereinabove set forth, and having stood by and witnessed the completion of said addition to said dam, and remained silent, and its grantor having full knowledge of all of the acts of the defendant from the beginning of the erection of said plant and the raising of said dam and the probable effect thereof, and of the expenditure of defendant in connection therewith, and remained silent, and having communicated its said knowledge and conduct to said complainant before said purchase, said complainant is precluded from any remedy, unless it be for damages in a court of law.

We have thus, at the risk of polixity, set forth the substance of the pleadings in order to show the range and scope of the issues upon the hearing. This case was heard in September, October, and November, 1908; the testimony having been taken in open court before the trial judge as in a suit at law. The testimony covers over 1,600 pages of the printed record, besides a volume of exhibits. We cannot undertake in the disposition of this case to quote at length from this testimony. The case seems to have been held under advisement by the trial judge for a considerable period, and the final decree was entered on the 11th day of July, 1910.

In and by the decree the court found that the respective parties were the owners of the respective dams and power, as alleged in the pleadings. It also found that de-

fendant's dam was originally constructed at the height of eight feet, and that the height and crest thereof were evidenced by a bench mark on the north abutment of the bridge on Washington street across the said river in the village of Constantine, and the said dam so constructed was so maintained for many years prior to 1902; that said bench mark was afterwards transferred to the Scoviile Block, in the village of Constantine, which latter mark is at the same elevation and level as said original bench mark on said bridge abutment; that the defendant, prior to the commencement of this suit, and between and during the years 1902 and 1905, placed on the crest of said dam an addition or superstructure of approximately 30 inches in height, so that the water of said river was thereby set back upon the properties of said complainant, whenever the same was ponded above the crest of said dam as originally constructed; that said dam as originally constructed was provided with a wasteway in the race leading therefrom, through which the water could be discharged, and during ordinary stages of the river the elevation of the surface of the water ponded by said dam could be kept at a point no higher than the crest of said original dam; that before the bringing of suit, and between the years 1902 and 1905, the said defendant removed said wasteway and constructed a power house containing such number and size of wheels as to be able, by the use of such wheels, to keep the water ponded by said dam, except during extreme high water, at a point not higher than the crest of said original dam; that the ponding of water by said dam at a point higher than the crest of said original dam, or at a point above said bench mark before referred to, sets back the water so ponded into the tailrace and on the wheels of the complainant.

The court further found that it was entirely practical and feasible to so control and pond the water of said river at said defendant's said dam by discharging the same through said wheels during all stages of water, except extreme high water, so that its surface elevation shall

not be higher at said defendant's dam than the crest of the original structure thereof; and that an additional elevation of water ponded by said Constantine dam in fact backs into said paper mill tailrace, and is a wrongful invasion of the complainant's rights. And the court further found that during the period of 48 months the said defendant had wrongfully backed the water into the tailrace and upon the wheels of the complainant to such an extent as to cause said complainant a loss of power and damages amounting to the sum of $3,420. The court, by its decree, directed that a plain, distinct, and permanent mark be placed at a convenient distance from the defendant's dam, so that the same should be in plain view; and that the same should be so marked as to show plainly the elevation of the crest of said defendant's original dam and the elevation of the surface of the water at all times, and should be identified and witnessed by bench marks or witness marks placed upon permanent objects, which should be done under direction of a commissioner of the court, who should make full report thereof. It was further ordered and decreed that the defendant be perpetually enjoined, restrained, and forbidden from ponding the waters of said river at its dam at Constantine at a higher elevation than the crest of said original dam, as evidenced by said bench mark, and fixed, established, and witnessed as above set forth, and from so raising the water by ponding the same at this dam that the same shall set back upon the wheels of said complainant. It also directed the payment by the defendant of the damages aforesaid, with costs of suit. From this decree the defendant has appealed, and the case has been argued at great length by numerous briefs of counsel, as well as by oral argument at the hearing.

Aside from the questions of fact involved in the case, defendant insists that there are certain questions of law involved which ought to dispose of the case in its favor:

(1) It urges that there are necessary and indispensable parties, not before the court, whose rights are affected by

the decree; and that, where such is the case, the bill must be dismissed.

(2) That complainant, believing that the raising of the dam would back water upon its property, having stood by, and, without advising defendant of such belief, permitted defendant to expend large sums of money in the raising of the dam and the making of the improvements incident thereto, is now estopped from asking the abating of the dam, or any portion of it.

(3) That the loss to the defendant by the granting of the injunction would be out of proportion to that suffered by complainant, in case the injunction is denied.

(4) That the decree below is inconsistent, in that, while it finds that defendant has a right to maintain a dam eight feet high, as evidenced by a bench mark on the north abutment of the bridge on Washington street across said river at the village of Constantine, over the crest of which dam the evidence shows that water flowed for many years, yet, said decree enjoins the defendant from ponding the water of said river at its said dam at a higher elevation than the crest of a dam eight feet high, as evidenced by said mark on the abutment of said bridge.

(5) That the evidence in the case does not show that complainant has been damaged to any extent, and the decree is erroneous in awarding damages to the amount of $3,420. That there is no evidence in the record upon which damages can be based, and if any damages have been sustained by complainant they are of slight extent.

(6) That there is no evidence in the record to warrant any decree in favor of complainant, and the bill of complaint should have been dismissed.

We shall consider these questions in the order in which they have been urged by the defendant.

1. It is urged by defendant that the Royal Trust Company and H. E. Ambler, as trustees under the trust deed in the nature of a mortgage, should have been made defendants in this suit; that these trustees and the bondholders whom they represent were vitally interested in the subject-matter of this suit, for the reason that any decree affecting the right of defendant to maintain this dam at the height to which it was increased would, to a large extent, destroy the security covered by the mortgage, and

would practically wipe out the investment made with the bondholders' money.

Are these trustees necessary parties, without the presence of whom the decree should not stand?

First, it may be observed in this connection, that the nonjoinder of these parties is not raised directly by any pleading in the case. The objection probably could not have been raised by demurrer, because the claimed defect did not appear on the face of the bill. The most appropriate way to have raised the question, probably, would have been by plea. It will be observed by a perusal of this record that these parties have not asked to intervene or come into the case. While the defendant in its last amendment has stated the fact of the making of the trust deed, it does not distinctly claim any nonjoinder of parties by its amendment. It is only fair to say, however, that the record discloses that the defendant raised the question of want of parties, and urged the court to dismiss the bill for that reason. We have examined the cases cited by defendant's counsel in their brief; but we are unable to find a case where the mortgagee is held to be a necessary party in a case like the one under consideration.

Counsel call our attention to *Bemis* v. *Clark*, 11 Pick. (Mass.) 452. That action was case for a nuisance in obstructing the plaintiff's water privilege by a dam. The trial had resulted in a verdict for the plaintiff. Afterward, under the practice, plaintiff moved the court that, in addition to the common execution for damages and costs, it would issue a warrant to abate and remove the defendant's mill dam, because it had been adjudged a nuisance to the plaintiff. Before commencement of the suit, it appeared that defendant had mortgaged the property to one Upham and others. Notice of the plaintiff's motion was given to the mortgagees by order of the court. The motion of the plaintiff was opposed, because the mortgagees had had no opportunity of being heard upon the trial of the action, and that they were not precluded by

the judgment against the mortgagor.   Upon the denial of the motion, the court said:

"It has been suggested, however, that Clark, against whom the judgment was recovered, is a bankrupt; and that a suit against him and a judgment upon a recovery of damages, would be wholly unproductive. It is admitted that he has now no interest in the dam which was found to be a nuisance, but that it is held by Upham and others under Clark's deed, which was made and recorded before the action was brought against Clark. Now an action may be sustained against those who *continue the obstruction*, and it is not contended but that they are solvent. If they are bound by the former judgment, then the plaintiff will be sure of his damages. If they are not bound by the former judgment, then it would be manifestly unjust to abate the dam before they have been heard upon the lawfulness of its erection. It is said that it can be proved that they had notice and were present (or might have been) at the former trial, and therefore cannot set up this defense. But we cannot know that to be the case judicially. The record of the court in the case does not give any evidence of the alleged fact. It is true that they are only mortgagees; but to many most important purposes, the interests of the mortgagor and mortgagee are distinct. In the case of *Colton* v. *Smith*, at Hampden, this circuit, it was held that a partition made by the mortgagor was void as against the mortgagee.

"The result may be, that the plaintiff may find it necessary to bring another action against those who *now keep up the dam*, and who claimed a title in the premises before the former action was brought; and we cannot help the plaintiff in that respect, much as we desire to prevent litigation."

We think the above case is readily distinguished from the instant case. There the mortgagee was evidently in possession; and it is elementary that an action of that nature could be sustained against any one in possession who continued the obstruction. 2 Farnham on Waters and Water Rights, pp. 1812–1818. Here we are dealing with a case where neither the trustees nor bondholders are entitled to possession or control of the property. In fact, this record fails to show by any competent evidence that

any of the bonds have been sold or negotiated. The evidence shows the delivery of these bonds to the principal stockholder of the defendant. Again, it should be noted that the mortgage in evidence, in its description of real estate, concludes as follows:

" All of the lands hereinbefore described, being situate in section twenty-three (23) in township No. 7 south, range twelve (12) west, meridian of Michigan, being in the township of Constantine, county of St. Joseph, State of Michigan. The foregoing real estate comprises all the lands upon which are located the company's water power plant, electric lighting and power plants, and all the buildings, machinery, appliances, fixtures and facilities used therewith, or in any wise belonging or appertaining thereto; and it also comprises all the land which is in any wise connected with or used in or for the business of the company."

Certainly lands purchased for flowage to accommodate the proposed increase in the height of the dam are none of them in section 23; neither are they within the description of the mortgage; and therefore, so far as those lands are concerned, no notice can be charged against the complainant of the rights or claims of the trustees. And there is nothing in the mortgage that would authorize the trustees to defend litigation of this nature.

We think there is force in the position of the complainant that it is not the purpose of this suit to take property from the defendant, but only to restrain its wrongful use, and that such suit should be brought only against the parties who are tort-feasors. Certainly no injunction could issue against the trustees, who, in so far as this record shows, have no possession or control over the property of the defendant. It is not claimed that the trustees have done, or consented to the doing of, any act causing the injury; nor can the trustees come into the control or management of the property, unless the defendant shall make default under its trust deed. We do not think that the question was really before the court below; nor is it before this court. The remainder of the

cases cited by counsel for the defendant have to do with suits affecting the title to the property itself, where the direct result would be to interfere and take away the security of the mortgagee. In the examination of this question, we have noticed the case of *Union Trust Co.* v. *Cuppy*, 26 Kan. 754. In that case the Trust Company was in possession of the property of a railway company and operating the road, and was held liable for participating in maintaining the nuisance, caused by certain obstructions in a water course. As we have already said, we have been unable to find an instance where a mere mortgagee is held to be a necessary party in a case where a defendant has been held guilty of setting back water above its own premises upon the premises of the complaining party, and we must therefore hold that there is no merit in this claim of the defendant.

2. This brings us to the question of the claimed estoppel. As was said by this court, in *Turner* v. *Hart*, 71 Mich. 128, at page 139 (38 N. W. 894, 15 Am. St. Rep. 243):

"It is not always a matter of course to grant relief in such cases, in a court of equity, when the law side of the court is open for legal redress. The extent of the injury, its character, the comparative values of the properties affected, and other considerations which may present themselves under the varying circumstances, ought to be duly weighed, and relief afforded or withheld, as equity and good conscience require."

It is well that we should understand what the defense is under this subject of claimed estoppel. Mr. Edward B. Linsley, the manager of the complainant, was examined upon this subject, and it appears that the complainant acquired the paper mill property in November, 1904; that its officers knew that two years before that time defendant had entered upon the work of raising its dam, and that it had extended the new dam at a height of approximately 30 inches across about half of the river, and that they, at

the time of the purchase, were aware that it was the intention of the defendant to complete that dam clear across; that the officers of the complainant did not approach any of the officers or parties interested in the defendant with reference to the latter's going forward with its work; that up to the time the dam was completed they did not convey to the defendant any information that they believed it was going to interfere with complainant's rights, although they believed that its completion would interfere with their property; that one Mr. French, who had charge of the paper mill property before complainant's purchase, had contemplated a suit to restrain defendant, but that he had been advised that he had better let the dam be built, rather than to attempt to stop its building, for the reason that after it was built they could then, by measuring, actually find out how much the water was set back upon their property, whereas otherwise it would be simply a matter of estimate. It also appeared that complainant's officers knew that the defendant claimed that the raising of its dam would not back water upon complainant's property; that it was the claim of defendant that it would not set back the water above Drumheller's bridge. It further appears that on or about the 29th of June, 1905, the attorney for complainant served upon the receiver of the defendant company, a notice, as follows:

"I am instructed to notify you that in raising the water of the St. Joseph river, by dam at Constantine, you are injuring the Sheffield Car Company power at this place (Three Rivers); you are hereby requested to restore said dam to its former height, without delay.

"It is hoped that you will take such steps at once as will obviate the necessity of any further action by said Sheffield Car Company."

Later, and on or about February 16, 1906, and before bringing suit, a further notice, addressed to the defendant, its manager, and Leonard J. Botting and C. H. Randle, was served, as follows:

"You are hereby notified that by the raising of the

dam of the Constantine Hydraulic Company at Constantine, Michigan, which has been recently done, the water of the St. Joseph river, on which said dam is situated, has been set back upon the St. Joseph river water power at Three Rivers, Mich., which said power is owned by the Sheffield Car Company. This setting back of the water has materially decreased the efficiency of the said water power owned by the said Sheffield Car Company, and has already caused said Sheffield Car Company a considerable damage, and is daily causing said Car Company material damage. You are hereby notified and requested to at once abate so much of the dam of the said Constantine Hydraulic Company, as has been so as aforesaid recently raised, and so much of said dam as has been so raised within the past six years that it has set back or raised the water in the St. Joseph river at the St. Joseph river water power at Three Rivers, Michigan, above the height at which said water was, before said raise was made. The Sheffield Car Company will hold you for all damages it has already suffered, and what it may hereafter sustain, by reason of the aforesaid raising of said dam, up to the time when it shall be abated as above requested."

The bill of complaint was filed in this case and subpœna issued on April 26, 1906.

Samuel S. Reed, a witness for complainant, testified that he was employed by Mr. French, the president of complainant's predecessor in title, September 1, 1902; that French told him that he had understood that they were going to raise the dam at Constantine; "that the parties said they were not going to back water above Drumheller's bridge, but he believed that they had all the flow that they were entitled to, and that a raise in the dam would affect his power;" that French told him to take measurements, watch the effect of the dam on the water in the pond and at the tailrace.

Defendant's counsel have cited the following cases in this court: *Jacox* v. *Clark*, Walk. Ch. (Mich.) 249; *Blake* v. *Cornwell*, 65 Mich. 467 (32 N. W. 803); *Miller* v. *Cornwell*, 71 Mich. 270 (38 N. W. 912); *Stone* v. *Lumber Co.*, 59 Mich. 24 (26 N. W. 216); *Cornwell*

*Manfg. Co.* v. *Swift,* 89 Mich. 503 (50 N. W. 1001); *Allen* v. *Electric Co.,* 144 Mich. 370 (108 N. W. 79, 115 Am. St. Rep. 453); *Ronayne* v. *Loranger,* 66 Mich. 373 (33 N. W. 840). Circumstances vary so much in different cases that it is difficult to find two cases alike; and it is evident that each case should be governed by its own peculiar circumstances.

Referring to *Blake* v. *Cornwell, supra,* it is readily seen that there was strong ground for the application of an estoppel. The complainants' minor sons, with their consent, labored for defendants on the new dam, boarding at home. Complainants had information of the daily progress of the work, and that defendants intended to raise the new dam higher than the old one, and that it was liable to increase the overflow of their lands, but that the extent of such increased flowage was not known to them; that defendants intended to compensate all persons injured by such flowage by agreement, if possible, but, if not, by condemnation proceedings, which they supposed the statute authorized them to take. It also appears in that case that one of the complainants, Thomas Blake, had one or more interviews with one of the defendants while the dam was in process of construction, in which he was informed that the dam would be raised higher than the old one and probably increase the flowage of complainants' land, for which additional flowage defendants agreed to settle; but no agreement or understanding was arrived at as to the terms of such settlement.

We think the case, in its facts and principles, clearly distinguishable from the instant case. In the case with which we are dealing, there is no claim that complainant gave any express consent or acquiescence, or that it stood by and allowed the raising of the dam to proceed upon any claim of the defendant that it expected to back the water above Drumheller's bridge. What the effect of raising the dam was to be was a controverted question between the parties. It does not appear by any testimony in the case that the defendant in any way, or to any de-

gree, relied upon any acquiescence of the complainant or any of its officers.

In *Miller* v. *Cornwell, supra,* this court recognized the familiar doctrine that the granting of injunction is not a matter of right, and, as matter of equitable discretion, it must depend on circumstances. It there appeared, and this court there found, that there was reason to believe that complainant knew, or might have known, had he chosen so to do, that defendants' new dam would throw water back further than the old one. He claimed to have discovered that as early as July, 1881. He took no steps to get the dam removed, although he complained of it; but some negotiations were had looking to his grant of a right of flowage, and they differed on terms, and defendants gave him to understand that they would not pay so large a sum as he demanded. Complainant then elected to sue for damages, and, defendants having invested their money and pursued their business without warning of other proceedings, after the dam had been up and the mill running about three years, arbitration proceedings were agreed on which would have fixed the price of flowage and secured the right. There seemed to be no reasonable excuse for complainant's refusal to proceed with them, and the bill was not filed until four years and a half after the mill was running, and after it was known how far the dam set back the water. Under these circumstances, it was said by Justice CAMPBELL that it was very doubtful whether equity ought to relieve at all. In that case the testimony was very unsatisfactory in character, relating to the injuries of the complainant, and it was said the definite testimony came chiefly from the other side. We think the case is readily distinguishable from the instant case.

These cases were distinguished in *Miller* v. *Bank of Belleville,* 148 Mich. 339 (111 N. W. 1062), and it was there said that, under the circumstances of that case, it would be an extreme application of the doctrine of estoppel by nonaction to deny the relief to which complainants

were otherwise entitled. The case last above cited is worthy of examination upon the facts.

In *Stone* v. *Lumber Co., supra,* relief was granted to the complainant, and the fact was noted by the court that neither the complainant, nor any person authorized by him, ever consented to the erection or maintenance of the dam. It is true that other action was taken before the dam was completed.

In *Cornwell Manfg. Co.* v. *Swift, supra,* the complainant utterly failed to make out the case set up in its bill; but the court, in its discretion, undertook to preserve its mill and dam by placing a restriction upon defendants which complainant might avail itself of by payment of the damages awarded. The facts in that case are so different from those in the instant case that they do not seem to aid us in this case.

In *Allen* v. *Electric Co., supra,* it was held that the owner of land bounded by a stream is entitled to have the water enter and leave his premises in the natural and ordinary way at all times, as well during times of ordinarily high water as during times of ordinarily low water, and the lower proprietor, who interferes with that right by building a dam, is liable for the damages occasioned, though the dam is not as high as low-water mark at the lowest point of the upper proprietor's land. The reading of that case shows that the damages were inconsiderable; but it was found to be a case where an award of damages, instead of an injunction, was held proper, upon the theory that complainants, having sought equity, should do equity, and accept reasonable compensation for past and future damages, instead of requiring a disproportionate sacrifice by the defendant through the crippling of its water power and business.

In *Ronayne* v. *Loranger, supra,* the evidence was not returned on appeal, and the bill was dismissed. As an authority, the case is very unsatisfactory.

We think that the general rules governing the doctrine

of estoppel are applicable here. One of those rules is that, where the facts are known to both parties, or where both parties have the same means of ascertaining the truth, there is no estoppel. In 11 Am. & Eng. Enc. Law (2d Ed.), p. 428, a rule is laid down in this language:

" It may be stated as a general rule that if a person having a right, and seeing another person about to commit, or in the course of committing, an act infringing upon that right, stands by in such a manner as really to induce the person committing the act, and who might otherwise have abstained from it, to believe that he assents to its being committed, he cannot afterwards be heard to complain of the act. This, it has been said, is the proper sense of the term ' acquiescence,' which, in that sense, may be defined as quiescence under such circumstances as that assent may be reasonably inferred from it, and is no more than an instance of the law of estoppel by words or conduct." See cases cited.

At page 434 we quote the following language:

" It may be stated as a general rule that it is essential to the application of the principle of equitable estoppel that the party claiming to have been influenced by the conduct or declarations of another, to his injury, was himself not only destitute of knowledge of the state of the facts, but was also destitute of any convenient and available means of acquiring such knowledge; and that, where the facts are known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel." See cases cited.

It may be said that it does not appear from this record that complainant knew that its property was being threatened by the defendant; but it does appear that the defendant insisted that it would not be so affected. There was no false representation or conduct on the part of complainant which would work an estoppel. The defendant's articles of association, a public record, limited its flowage rights to Constantine township, in so far as any record existed. In increasing the height of its dam and resetting its wheels, the defendant, according to its own claim, relied on the advice of its own engineers, and was in no way

influenced by any act or conduct on the part of complainant.   Complainant ought not to be charged with knowledge which defendant claims it did not have.   It does appear that defendant had been advised by a competent engineer that its proposed improvements would back waters onto the Three Rivers properties and involve the defendant in litigation.   It is true that Mr. Mead seeks to qualify this statement to the defendant by showing that he was not in possession of sufficient data upon which to form an accurate judgment.   It appears, however, from his report, that he had before him certain information which had been obtained by the defendant from other engineers; and it would seem that the information given by Mr. Mead to the defendant was sufficient to put it on its guard, and it should have proceeded thereafter with caution.   Many cases in this State might be cited upon this subject of equitable estoppel.   We cite a few only: *Maxwell* v. *Bridge Co.*, 46 Mich. 278 (9 N. W. 410); *Fletcher* v. *Kalkaska Circuit Judge*, 81 Mich. 186 (45 N. W. 641); *Gooding* v. *Underwood*, 89 Mich. 187 (50 N. W. 818); *Stanton* v. *Manufacturing Co.*, 90 Mich. 12, 18 (51 N. W. 101); *Smith* v. *Sprague*, 119 Mich. 148 (77 N. W. 689, 75 Am. St. Rep. 384); *Marquette County Sav. Bank* v. *Koivisto*, 162 Mich. 554 (127 N. W. 680); *Priewe* v. *Improvement Co.*, 103 Wis. 537 (79 N. W. 780, 74 Am. St. Rep. 904); *Fox River Flour & Paper Co.* v. *Kelley*, 70 Wis. 287 (35 N. W. 744).

We are therefore of opinion that defendant is not in position to raise the question of estoppel; it not appearing that it was in any way influenced by any conduct or declaration of the complainant.   Nowhere does it appear in the testimony that the defendant relied upon any representation or act of the complainant, and without such reliance the doctrine does not apply.   On the contrary, the defendant's amended answer, as well as the testimony of Mr. Botting, distinctly states that it relied on the reports of its own engineers.   See an instructive note to *Penrhyn*

*Slate Co* v. *Power Co.*, 181 N. Y. 80 (73 N. E. 566), found in 2 Am. & Eng. Ann. Cas. 786, where it is said:

"Something more than mere passivity while the expense is being incurred is generally necessary to create the estoppel. In cases of silence there must be not only the right, but the duty, to speak before a failure to do so can estop the owner. Thus a person by merely standing by and failing to object while the improvements are being constructed, is not estopped from obtaining relief in equity against a diversion of the water, where the expenditure is made with notice, actual or constructive, of his superior rights"—citing many cases.

An equitable estoppel *in pais* requires, as to the person against whom the estoppel is claimed, opportunity to speak, duty to speak, failure to speak, and reliance in good faith upon such failure.

3. It is the claim of the defendant that the loss to it by the granting of the injunction would be out of proportion to that suffered by complainant; and that therefore the injunction should be denied. We cannot say from this record that the doctrine of greater convenience is applicable here. It is true that this court has held, in the cases cited by defendant, that, if it is apparent that the relief sought is disproportionate to the extent of the injuries sustained, the court will not interfere, but will leave the parties to some other remedy. The court below, instead of requiring the dam to be lowered by its decree, simply required the defendant to regulate the quantity of water that the dam should contain. We are not satisfied that by the proper use of the water which the defendant· may hold under this decree it will not be amply sufficient for the performance of its public and private contracts. The testimony shows that the complainant has expended large sums of money in the purchase and construction of its plant, and is annually expending large sums of money and employing a large number of persons in carrying on its business. This may be equally true as to the defendant; but we cannot say that there is here any reason to

apply the law of the doctrine of paramount necessity. To establish its right to an injunction, it was incumbent upon complainant to show, by a preponderance of the evidence, that there were reasonable grounds to fear the continuance or such frequent recurrence of the flooding or setback complained of as seriously to affect the value of its property; and that these considerations rendered its remedy at law inadequate. We think that complainant has met and sustained the burden of proof in that regard. There is much learning upon the subject; but we content ourselves with citing the case of *Hennessy* v. *Carmony*, 50 N. J. Eq. 616 (25 Atl. 375), where Mr. Justice Pitney discusses the question in its application to a continuing injury to land.

4. It is the claim of the defendant that the decree is inconsistent, in that, while it finds that the defendant has the right to maintain an eight-foot dam, over which the evidence shows that water flowed, yet the decree enjoins the defendant from ponding the water in its dam as raised to a point higher than the crest of the original dam, thus depriving the defendant of the full head of water it would be entitled to at its dam.

The points between where this water is ponded and where it is claimed it does the injury are some eight miles apart. If a decree only enjoined the flooding of complainant's property in a general way, the defendant might be unable to defend against contempt proceedings, although in fact blameless; but by a decree permitting the defendant to hold the water at a given point on its own premises defendant will thereby always be protected against changes in volume, and it can intelligently observe the rights and duties established by the decree. It is to defendant's advantage that a decree should plainly state what it may do at its end, without holding it responsible for what may happen at complainant's tailrace and property. Instead of putting the defendant to the expense of actually lowering the dam, it seems equitable to require it to hold the water at a certain head.

We think, however, that the decree below should be so modified as to permit the defendant to have the benefit of the full head of water that would flow naturally over the crest of an eight-foot dam. Defendant should have the same power which it would have with a dam standing at eight feet. The exact amount of the overflow is not directly shown by the evidence. What the depth of water on an eight foot dam would be with the natural flow of the river should be determined by the decree. If counsel cannot agree in this, the decree will require that the dam be reduced and lowered to the height of eight feet.

5. It is claimed by defendant that the evidence in the case does not show that complainant has been damaged to any extent, and it is claimed that the decree is erroneous in awarding damages to the amount specified in the decree. We shall not undertake to refer to the evidence in the case upon this branch of the subject. There is ample testimony in the case to sustain the decree upon this branch of the case, and, in our judgment, the amount fixed by the circuit judge was a very conservative sum. The amount determined was for the period therein specified as 48 months.

6. Lastly, it is the claim of the defendant that there is no evidence in the record to warrant any decree in favor of the complainant, and that the bill of complaint should have been dismissed. Upon this branch of the case, we shall not quote the evidence, but will content ourselves with saying that we have read the entire record and are of opinion that the equities of the case are strongly with the complainant, and that it has made out its case by a clear preponderance of the evidence. In examining the record, we have been impressed with the language of Justice CHAMPLIN, in *Turner* v. *Hart, supra,* wherein he said:

"Every author treating upon the subject of hydrodynamics acknowledges and points out the difference between theoretical and actual tests, and, in advancing practical rules, modifies the theoretical to correspond as nearly as possible to actual observation and experience. We

think the observation and experience of the witnesses introduced by complainants is controlling when brought in conflict with instrumental measurements, however accurately and carefully taken."

Not only did the circuit judge have the superior advantage of seeing and hearing the witnesses testify in the case, and of an acquaintance with the premises, which should have its due weight, but a careful reading of this record has led us to the same conclusion as that reached by him.

Some stress is laid by defendant's counsel upon the evidence showing that the mill tailrace of the complainant had been lowered; but the measurements which have been controlling with us, and seemed to have been controlling with the circuit judge, were measurements made at the surface of the water in the tailrace, and we are unable to see how the lowering of the tailrace would in any manner affect its surface elevation.

The decree of the circuit court, as above modified, is affirmed, with costs to the complainant.

MOORE, C. J., and STEERE, McALVAY, BROOKE, and OSTRANDER, JJ., concurred. BLAIR and BIRD, JJ., did not sit.