## COMMERCIAL INV. TRUST v. BAY CITY BANK.

### No. 6061.

Circuit Court of Appeals, Sixth Circuit.

Jan. 10, 1933.

L. V. Pylkas, of Detroit, Mich. (Max Kahn, of Detroit, Mich., on the brief), for appellant.

J. E. Duffy, of Bay City, Mich. (L. W. Bartlett and Duffy & Duffy, all of Bay City, Mich., on the brief), for appellee.

Before MOORMAN, HICKS and SIMONS, Circuit Judges.

SIMONS, Circuit Judge.

The controversy results from conflicting claims to priority asserted by two assignees of the same assignor to certain accounts receivable evidenced by installment title retaining contracts and promissory notes. Appellant is a finance company, organized as a Massachusetts common-law trust, and engaged in the business of loaning money upon customer's accounts, and appellee is a Michigan corporation, in the banking business at Bay City.

The material facts are as follows: Piggot's, Inc., was, prior to June, 1928, in the retail furniture business, selling on the installment plan. Title retaining contracts were taken from purchasers, who were given possession of furniture pending payment or default. Either concurrently with the execution of the contracts, or at some later date, Piggot's obtained from its customers short-term, interest-bearing, promissory notes, which contained upon their face the written memorandum printed in the margin.[1] Piggot's discounted these notes with the bank,

---

[1] "This note is given in settlement of my account of —— and in default of payment of same I agree to return all merchandise covered by same, together with payment for damage, use and costs. I agree not to move the goods covered by this account without written permission from Piggott's, Inc., until account is paid in full."

or assigned them to it as collateral security for loans, until on February 29, 1928, the bank held notes of Piggot's customers in an amount exceeding $215,000.

In June of that year the finance company began negotiation for a loan to Piggot's of $100,000, secured by the latter's accounts receivable. It sent a representative to Bay City, who examined its books and records, and interviewed its manager and its auditor. This representative, learning that Piggot's owed a substantial sum of money to the bank, interviewed its president, informed him of the contemplated loan on the security of customers' accounts, and inquired relative to the bank's attitude toward Piggot's indebtedness. The bank's president expressed confidence in Piggot's, denied any intention to discontinue the line of credit then existing, but announced a desire not to increase it. There was no discussion of customers' notes held by the bank. On the same day Piggot's presented to the finance company, along with its application for the loan, a financial statement showing, among other things, an indebtedness to the bank on customers' notes of more than $200,000. This financial statement was forwarded to the finance company's home office, and on June 12, 1928, it addressed a letter to the bank asking to be advised whether the figures in Piggot's financial statement agreed with the files of the bank as of the date of the statement; whether Piggot's had increased or decreased liability since that date; and whether it was obligated to the bank in any other manner. The letter also requested an opinion as to the moral and financial responsibility of Piggot's. To this letter the bank made reply on June 15, 1928, stating it had done business with Piggot's for over twenty years; that it considered the management conservative; that its claimed losses were small for the volume of business done; that Mr. Piggot, who might be said to be the sole owner and manager, was a man of good character and habits, and very attentive to business; and that the line of indirect credit had been increased by $10,000 since the date of the statement.

Without making other inquiries of the bank, or receiving other communications from it, the finance company then loaned Piggot's $15,000 on its promissory note, and as collateral thereto received from Piggot's an assignment of customers' sales contracts, which on their face showed an unpaid balance due of $22,500. Piggot's note recited the assignment of the contracts, guaranteed they were free and clear of liens, and had not been transferred or assigned, or given in any way as collateral security or otherwise to any other person, authorized the finance company to audit books and records of Piggot's relating to collateral, and to collect from the makers the amount due thereon.

Neither the bank, after discounting Piggot's customers' notes, nor the finance company, after taking the installment contracts as collateral, notified the debtors of the respective assignments. Piggot's remained in possession of the installment sales contracts, and collected thereon from its customers. Such collections as Piggot's paid over to the bank in reduction of its indirect obligations were paid in lump sums. No payments were made to the finance company, and when, in November, 1928, dissolution proceedings were begun, followed by bankruptcy, both assignees learned for the first time that the installment sales contracts assigned to the finance company represented the same accounts receivable as were covered by customers' notes discounted with the bank. It was also discovered that five notes discounted with the bank after the loan was made by the finance company represented accounts previously assigned to the finance company as collateral.

■■ The principal contention of the finance company is that the bank is estopped because of negligence and acts amounting to equitable fraud from claiming priority upon any equitable theory. The evidence does not support its argument. When the bank was informed by the finance company that it contemplated a loan to Piggot's on the security of its book accounts, it had no more reason to believe that installment contracts already represented by customers' notes discounted with it would be offered as collateral than the finance company had to believe that such accounts. The record shows that a simple the time the loan was made, the finance company had in its possession a financial statement showing over $200,000 of indebtedness to the bank on customers' accounts and the bank's report of an increase of $10,000 in such acounts. The record shows that a simple inquiry to the bank would have immediately elicited the information that the two assignments covered the same receivables. There was here no fiduciary relationship between the parties, and, in the absence of such relationship, it is well settled that, where both parties have the same information, or the same means of ascertaining the truth, there can be no estoppel. Fellows v. National Can Co., 257 F. 970 (C. C. A. 6); Slaughter's Adm'r v. Gerson, 13 Wall. 379, 20 L. Ed. 627; Brant v. Virginia Coal & Iron Co., 93 U. S. 326, 23

L. Ed. 927; Sheffield Car Co. v. Constantine Hydraulic Company, 171 Mich. 423, 137 N. W. 305, Ann. Cas. 1914B, 984; Bright v. Allan, 203 Pa. 386, 53 A. 248; Ft. Scott v. W. G. Eads Brokerage Co., 117 F. 51 (C. C. A. 8).

The court below held that the bank was entitled to priority to all of the accounts represented by the notes discounted with it, on the ground that the notes were in payment of the accounts, with the result that the purported assignments of the contracts to the finance company were of no force or effect. We find it unnecessary to dispose of the case upon this ground. While the notes recite that they were given in settlement of particular accounts, they also contain upon their face recitals which seem to cast some doubt upon the intention of the parties to consider them as payment. Even if right with respect to notes given by customers subsequent to execution of installment contracts, the court can hardly be right with respect to notes given concurrently therewith. It is not conceivable that a debt can be paid by the very instrument which evidences its creation. Nor do we find it necessary to decide, as urged by the bank, that the notes given concurrently with the contracts were the primary obligations whose assignment carried with it an assignment of all collateral security. It seems to us that we have here a simple equitable problem involving two good faith assignees, both without fault, neither occupying a fiduciary relationship to the other, and that, in so far as equities may ever be said to be equal, they are here equal. The case arises in equity, and we are content to decide it upon the broad equitable maxim that "he who is first in time, is best in right." Judson v. Corcoran, 17 How. 612, 15 L. Ed. 231; Salem Trust Company v. Manufacturers' Finance Co., 264 U. S. 182, 44 S. Ct. 266, 68 L. Ed. 628, 31 A. L. R. 867.

If we are right in this, it follows that of the 88 accounts here in dispute the Bay City Bank, having received the notes in 83 of them prior to the transfer of the installment contracts to the finance company, is entitled to priority to the accounts represented by the latter notes, and the collections made thereon. It must also follow that the finance company, having received an assignment of the remaining five accounts before notes representing them were discounted with the bank, is entitled to priority in such accounts, and to collections made of them.

The court below denied the finance company priority to the five accounts upon the authority of National Safe Deposit, Savings & Trust Co. v. Hibbs, 229 U. S. 391, 33 S. Ct. 818, 57 L. Ed. 1241, and this case was relied upon by both of the litigants to support their respective contentions. That case dealt with a transfer of stock certificates indorsed in blank, and it was held that, where one of two innocent persons permits the indicia of ownership to remain in a third person, that he who has enabled such third person to occasion the loss must sustain it. The principle was there applied, however, to stock certificates, on the ground that they are a peculiar kind of property. Although not negotiable paper strictly speaking, they are the basis of commercial transactions large and small, and are frequently sold in open market as negotiable securities are. We are not required, however, upon this record to extend the principle there applied to conditional sales contracts. We are aware of no dealings in such instruments as negotiable securities.

It follows from what we have said that the decree below must be modified so as to give priority to the appellant in the five accounts transferred to it before notes representing them were discounted with the bank, and to deny priority therein to the appellee, and the decree so modified is affirmed. Costs are to be divided in proportion to amounts of recovery.