SAMUEL G. MILLER v. CORNELIUS CORNWELL AND CLARK CORNWELL.

[See 65 Mich. 467.]

*Equity—Nuisance—Bill to abate mill-dam—Laches—Estoppel—Damages.*

1. The removal of a mill-dam so far as it exceeds a proper height, by the decree of the equity court, is not a matter of right, but of equitable discretion, and must depend on the circumstances of the case.

2. It is quite possible for land-owners to estop themselves from seeking equitable aid to abate a mill-dam; and when they come into a court of equity for relief, and are not willing to comply with equitable conditions, it is competent to give them their choice to do justice or get their remedy where they can. A court of equity is not to be made an instrument of wrong.

3. In this case complainant is awarded $1,500 damages as entire compensation for the total injury to him by the continuance of the dam heretofore and hereafter.

Appeal from Washtenaw. (Newton, J., presiding.) Argued June 22, 1888. Decided July 11, 1888.

Bill to abate part of a mill-dam. Defendants appeal. Decree vacated, and new one entered granting complainant a less sum as full damages for continuance of dam, to be enforced as a money decree. The facts are stated in the opinion.

*Henry W. Rogers (Austin Blair* and *E. D Kinne,* of counsel), for complainant.

*Charles R. Whitman,* for defendants.

CAMPBELL, J. Complainant brought this suit in chancery to abate in part a mill-dam at Geddes, between Ann

Arbor and Ypsilanti, on the Huron river, and to get damages. The dam is the same which was litigated in *Blake v. Cornwell*, 65 Mich. 467 (32 N. W. Rep. 803).

The case presented, so far as essential to indicate the controversy, is this: Complainant, in 1880, bought a farm on the north side of Huron river, lying in part north of a highway running between Ann Arbor and Ypsilanti, and in part between the highway and the river. At this time a dam at Geddes on the mill property in question was down, and defendants were preparing to build a new one a few rods further down stream, to supply a pulp-mill built on the same mill-site occupied by a former mill destroyed. The new dam, by its lower position, got a higher head than the old one, which was not adequate. It is claimed that it was built higher than this gain in head would account for, and that it flowed the water back further than had been done by the old dam; that this back flowage reached and injuriously affected complainant's farm.

Complainant claims that his farm land lying between the highway and the river, is a parcel of substantially even and level land, which was in its natural condition a rich meadow, yielding heavy hay crops and some other crops; that the setting back of the water overflowed a considerable portion of it, and soaked and destroyed the utility of still more, so as to make the land nearly up to his house wet and marshy, and malarious. It is claimed the soil became unfitted for any but marsh grass, and became grown up to marsh plants, and incapable of yielding sound hay or other crops.

There is a very great conflict of testimony upon nearly all the facts important in the case. Much of the testimony is vague and speculative. Some is definite and intelligent. There is some direct conflict where witnesses

testify from their recollection, and some which is absolute.

The court below found that the dam had been raised high enough to injure complainant's lands, and allowed $2,000 compensation for the permanent right to keep up the dam without flash-boards, but refused to abate any part of the dam. Both parties appeal.

To understand the peculiar decree, it is necessary to state that after the mill got in full operation, and defendants had invested about $50,000, complainant brought an action at law for damages in 1883. The trial of this suit was not brought on, and in June, 1884, the parties executed regular articles of arbitration, each choosing an arbitrator, and those two choosing a third. When the arbitrators were ready to act, complainant refused to go on, claiming that the arbitration agreement covered more than he meant to cover. Thereupon the third arbitrator declined to act, and no further steps were taken. Complainant discontinued his action at law, and on January 13, 1886, he filed this bill, which gives no reason for the delay except the pendency of the Blake suit, and asks for an accounting of damages, and a removal of the alleged acts of nuisance.

It appears very clearly that the dam, as formerly maintained, in no way damaged complainant, and did not set the water back as far as his easterly line. There is no doubt that the dam as now kept up does set still water back beyond complainant's east line, but just how far it goes, and just how much harm is done, cannot be determined so easily. Some of complainant's testimony exaggerates the mischief very much beyond probability. Some of defendant's testimony puts it below what is probable. It is left for us, as it was for the court below, to ascertain what justice requires. But as both parties

appeal, some questions are presented in the outset to be passed upon.

Complainant claims that the relief should have gone to the extent of removing the dam so far as it exceeds the proper height. We do not think this is a matter of right. As a matter of equitable discretion it must depend on circumstances.[1]

There is some reason to believe that complainant knew, or might have known, had he chosen to do so, that defendants' new dam would throw the water back further than the old one. He claims to have found it out in July, 1881, before or at harvest time, when the growing crops were claimed to have been injured. Complainant took no steps then to get the dam removed, although he complained of it; but some negotiations were had looking to his grant of a right of flowage, and they differed on terms, and defendants gave him to understand they would not pay so large a sum as he demanded. Just what that was does not very plainly appear. The defendants had built their dam on the supposition that the mill-site condemnation act was valid. Complainant elected to sue for damages, and defendants invested money, and pursued their business, without any warning of other proceedings. After the dam had been up and the mill running about three years, arbitration proceedings were agreed on which would have fixed the price of flowage, and secured the right. No reasonable excuse is given for his refusal to proceed with them.

This bill was not filed until four years and a half after the mill was running, and after it was known how far the dam set back the water. Under these circumstances it is very doubtful whether equity ought to relieve at all. It is very certain that it ought not to interfere in com-

[1] See *Turner v. Hart*, 71 Mich. 128.

71 MICH.—18.

plainant's favor without requiring him to do equity himself; and we are satisfied that pecuniary compensation is all that should be given him. It is possible that there might be difficulty in granting specific relief to defendants, which would, as an original basis of equity, compel a specific performance of an express or implied license of flowage. But it is quite possible for land-owners to estop themselves from seeking equitable aid to abate a mill-dam; and when they come here for relief, and are not willing to comply with equitable conditions, it is competent to give them their choice to do justice or to get their remedy where they can. A court of equity is not to be made an instrument of wrong. In proving his damages complainant did not confine himself to loss of rent or annual crops, but went into the question of diminished market value of the land, which could be of no great pertinency except where damages are to be awarded once for all.

On the other hand, we think that the decree, which gave what was meant to be full compensation for maintaining the dam, should not have confined the right to maintain it to any particular use. If defendants pay for the water-power, it should belong to them.

Coming down to the merits of the controversy, we have been struck by the imperfect quality of the testimony on subjects that might have been made plainer. Complainant had the burden of proof to show the precise extent and character of his injuries; but the definite testimony comes chiefly from the other side. A number of witnesses swear that while the old dam was maintained the effect of it in throwing back the water extended to a certain tree on the bank, and no further. No careful levels seem to have been taken, either to determine from that how high the old dam was, or to determine the difference in elevation between that spot and the present dam, or some one of the various points claimed to be reached by the backed water

on complainant's land. Such levels are the only strictly reliable *data*, and, with those determined, any such variations as might be due to piling or other conditions could be readily allowed for.

The defense did introduce some testimony which has the merit of being definite upon some of the important issues. It was proved very clearly by men who had worked in the old mill, and who substantially agreed in their testimony, that they had a head of fully 10 feet, and a little more. This testimony is directly opposed to the estimates and guess-work of some of complainant's witnesses that it was three or four feet less. These witnesses could not be mistaken, and there is no reason to doubt their honesty. And it needs no long reflection to be satisfied that persons who, in an attempt to fix heights, make their own estimates frequently with a margin of 50 per cent., have no definite knowledge on the subject.

The measurements of Prof. Davis, while deficient in some of the desirable *data*, indicate that there could not be many inches difference between the height of the old dam and the new; and if the water was raised much higher by the new one, it is at least possible that it may be either from the more perfect construction of the latter, preventing leakage, or the effect of putting on flashboards, which would, while on, increase the practical height of the dam.

We have also been impressed by the difference in the testimony of those who have made careful examinations of the ground, and those who have not. It appears that there is a small stream running across complainant's land into the river, the mouth of which, according to most of the witnesses, strikes dead water near the east side of the land. The testimony substantially agrees that the current is checked but a very short distance up. There is also a swale running back nearly across the land towards

the northward. Upon the extent of the effect of the raising of the water in these two places the witnesses are hopelessly at variance. According to some witnesses there was a rise of three or four feet, and nothing short of this would satisfy other conditions which the witnesses refer to. But in October, 1887, four intelligent and reputable gentlemen, familiar with farming land in the vicinity, made a careful examination, which satisfies us they were in the main correct in their views concerning the condition of the land itself, as inconsistent with a large proportion of complainant's claims. If they saw what they say they saw, the river had not been raised materially beyond its natural bed, and the land had not been extensively damaged by either soaking or overflow, and was in some places naturally wet and springy. The testimony concerning the quality of the grass, and the character of the weeds, is also by some witnesses carried back to the time of the old dam, and shown not to have been due to artificial causes. Some allowance must be made for confusion of dates in matters of several years' standing.

In the absence of more definite *data* from actual comparative levels than complainant has introduced, and in the light of such testimony as seems most likely to be accurate, we are satisfied that the estimate made in October, 1887, and platted by Prof. Davis, is substantially accurate. If so, the decree is somewhat excessive. Allowing for past damages, which would have covered a shorter period but for the delays in proceeding, and allowing the most liberal compensation for land permanently damaged or destroyed, we think no more than $1,500 should have been given as compensation for the entire injury to complainant by the continuance of the dam heretofore and hereafter. There is no testimony of a definite character showing any unfavorable change in the healthiness of the

location traced to this dam. There is some theoretical testimony, but no substantial facts.

We are not disposed to change the decree so far as it relates to flash-boards. Defendants' testimony chiefly, if not entirely, refers to conditions traced to the dam itself. It is not impossible that some of the complainant's proofs of raising of the stream relate to its raising by the dam as supplemented by flash-boards. We have no idea that the discrepancies in testimony are due to intentional misrepresentation. In cases like this, accuracy of estimates should be attained by measurements, as far as possible, and not by guess-work.

While the general principles of the decree below are correct, we think an entirely new decree will have to be entered. The decree contains no finding, and we think it would, from the testimony, be impossible to find, just how far the height of the old and new dams differs. In case of an injunction, that difference would be the true allowance, as without some definite standard to measure the condition of the stream it cannot be known with precision when the high-water line is due to the dam and when to the swelling of the river, and the height of the old dam must be assumed lawful. It will be sufficient to require payment of the damages allowed within some specified time, leaving the enforcement of the decree to the usual methods on money decrees, and not by injunction. The decree below will therefore be vacated, and complainant will have a decree for the payment of the $1,500 allowed within 90 days, and also payment of costs at the circuit. We think it equitable that in this Court each party pay his own costs, except that the printing expenses of the record should be divided equally. Defendants, on payment of what they are required to pay, will receive a release of the right of flowage by the dam as

it stood at the date mentioned in the original decree, which was October 6, 1887.

The other Justices concurred.