LINK *v.* DIAMOND CRYSTAL SALT CO.

DIAMOND CRYSTAL SALT CO. *v.* LINK.

1. EQUITY—ONE WHO ASKS EQUITY MUST DO EQUITY.
   One who comes into a court of equity must be prepared to do equity.[1]

2. SPECIFIC PERFORMANCE — VENDOR AND PURCHASER — CONTRACTS MERGED AS SECURITY TREATED AS ONE.
   Where defendant purchased several lots from plaintiff on separate contracts, and later orally agreed to merge them as security for the advancement of the money for the building of a house for him on one of the lots by plaintiff, which has been fully completed, and for which defendant agreed to pay in monthly installments, but for which he now refuses to pay, plaintiff is entitled to a decree for the specific performance of all of the contracts, including the price of the house so advanced by it; defendant's claim that he is entitled to pay upon the other lots and receive deeds therefor being inequitable.[2]

3. FRAUDS, STATUTE OF — ORAL CONTRACT—PERFORMANCE BY ONE PARTY TAKES IT OUT OF STATUTE OF FRAUDS.
   An oral contract whereby defendant agreed to merge several written contracts for the purchase of lots into one as security for the advancement of money to him by plaintiff for the purpose of building a house is not void under the statute of frauds (3 Comp. Laws 1915, § 11975), where plaintiff has fully performed.[3]

4. SPECIFIC PERFORMANCE—DECREE MODIFIED TO CONFORM TO CONTRACT.
   The provision in the decree that the total balance due shall be payable in 90 days is modified, on appeal, to conform to the agreement that payment might be made "in such monthly or semi-monthly payments as will repay the entire amount so advanced in 10 years."[4]

Appeal from St. Clair; Law (Eugene F.), J.    Sub-

[1]Equity, 21 C. J. § 151; [2]Specific Performance, 36 Cyc. p. 544; [3]Frauds, Statute of, 27 C. J. § 410; [4]Specific Performance, 36 Cyc. p. 795.

mitted July 1, 1924.   (Docket No. 59.)   Decided October 6, 1924.

Bill by Alredred B. Link against the Diamond Crystal Salt Company for the specific performance of a land contract.   The Diamond Crystal Salt Company filed a bill against Alredred B. Link and another for the specific performance of certain other land contracts. The cases were consolidated.   From a decree for the Diamond Crystal Salt Company, Alredred B. Link appeals.   Modified and affirmed.

*Thomas Wellman,* for appellant.

*Burt D. Cady,* for appellee.

MOORE, J.   The issues involved in this litigation are so clearly stated by the trial judge that we quote his opinion as follows:

"It is agreed that the above suits be tried together. In the first case plaintiff seeks the specific performance, as contract purchaser of a contract for the sale of lot 17, Oakland Grove subdivision of a part of the city of St. Clair.   In its answer defendant denies that plaintiff is entitled to specific performance of the contract for lot 17 unless he pays for other lots in this plat which he has contracted to purchase and pays for the house which it has built for plaintiff on one of these lots known as lot 22.

"In the second suit the plaintiff, the Diamond Crystal Salt Company, prays for the specific performance of contracts for the sale of all the lots in the Oakland Grove subdivision which it has agreed to sell defendant Link and which Link has agreed to buy, and for the payment of the cost of the house on said lot 22 which it paid for building at Mr. Link's request. Frank Benedict, the father-in-law of Mr. Link, is also joined as defendant in this suit.

"FACTS:

"The Diamond Crystal Salt Company is a domestic corporation engaged in manufacturing and dealing in salt at the city of St. Clair, Michigan.   It employs

an average number of 400 men.   In the spring of 1919, it subdivided into 187 lots a tract of land consisting of 67 acres located in the southern part of the city of St. Clair and not far from its plant and named the plat the Oakland Grove subdivision.

"It then offered to sell lots for $200 each to its employees on time, on 10 per cent. of the purchase price as a down payment, and the balance to be paid each payday in small payments.   Further details of the plan are shown by a circular issued at that time, which reads in part as follows:

" 'After the lot has been paid for, the company is prepared to finance and help build homes on these lots, and as part of the plan, and to encourage the building of homes, will give the "home builder" credit toward building his home for $100 rebate on the purchase price of his lot, making the actual cost of the lot $100, which is as near as we can figure the cost of these lots to us.

" 'And to help you build your home we will finance you to an amount not to exceed twice your present yearly earnings with this company.   For instance a man earning $4 per day would be earning $1,200 per year, figuring 300 working days per year, we, therefore, would finance the building of a home costing not to exceed $2,400; or a man earning $6 per day would be getting $1,800 a year and for such a one we would arrange for a home costing up to $3,600, if he so desired.

" 'When the home has been built the money advanced can be paid back to us in instalments, just as rent is being paid today, and the payments will be so arranged as to extend over a period of 10 years if necessary—the party building the home, of course, to pay the taxes, insurance and 6 per cent. interest, on the unpaid portion of the money advanced.'

"Mr. Link was employed by a contractor who worked for the Diamond Crystal Salt Company.   However, the officials of the company treated him as its employee and  on either his application or that of his wife or of both, contracted to sell him lots as follows:  On July 12, 1919, lots Nos. 21 and 22; on July 29, 1919, lots Nos. 18, 19 and 20; on August 4, 1919, lot No. 17 and on September 8, 1919, lot No. 16.   Sometime in September, 1919, Mr. Link concluded that he would take advantage of the home building plan as set out in the circular as above quoted, and have the Diamond Crystal Salt Company finance the building of the house

for him on lot 22.    In pursuance of this idea both Mr. Link and Mrs. Link, his wife, had an interview with Franklin Moore, one of the officers of the company.    Inasmuch as the offer of the company was to build houses only on lots fully paid for, some discussion was had of the fact that lot 22 was not fully paid for.    Mr. Link said that he had paid more than $200 on all of the lots purchased by him, and that he thought the company would be safe in building the house on lot 22.    Mr. Moore inferred from this that Mr. Link desired all the contracts to be treated as a unit as security for the house building plan and orally agreed to finance the building of the house on lot 22. I am forced to conclude that Mr. Link had the same understanding of the agreement in this respect as had Mr. Moore.

"Mr. and Mrs. Link had a catalogue of Aladdin ready-made houses showing a cut of a house they desired to build, which catalogue they took to the engineer of the company who made plans more in detail for the house.

"The James O'Sullivan & Sons Company, of Port Huron, was then engaged in building other houses on this plat for the Diamond Crystal Salt Company and William Graham was the foreman in charge for O'Sullivan.    Mr. Link went to Mr. Graham, presented the plans and asked Mr. Graham to build the house. Mr. Graham, after consulting James O'Sullivan, agreed to do so and sometime in October, 1919, started the work.    The house was completed in May, 1920, at a total cost of $6,177.30.    Before the house was fully completed and on January 23, 1920, Mr. Link and family moved into the house.

"The Oakland Realty Company I understand to be a corporation organized in the interest of the Diamond Crystal Salt Company and to act as its agent looking after the sale of lots and the building of houses in the Oakland Grove subdivision according to the plan announced in the circular heretofore mentioned.    The Oakland Realty Company had a blank called 'Special Home Building Contract' to be used to contract with employees who elected to build houses on their lots. Such a blank was filled out and presented to Mr. Link to sign sometime in July, 1920.    In this contract the estimated cost of the house which Mr. Link had

built on lot 22, and which the Diamond Crystal Salt
Company had paid for, as hereinafter related, was
fixed at $6,000; this proposed contract provided that
Mr. Link should pay $50 on the 15th of each month.
Mr. Link refused to sign this contract.   On or about
November 23, 1920, the Diamond Crystal Salt Com-
pany caused the following notice to be served on Mr.
Link:

                              "November 23, 1920.
"Mr. BERT LINK,
    "St. Clair, Michigan.
    *"Dear Mr. Link:* Several attempts have been made to get you
to sign up a definite contract on your house and start payments
on same.    The company has been more than lenient with you
and it hardly seems as though you had done the square thing
by us.
    "Unless you come in and talk things over and make definite
arrangements with us, we shall be obliged to take steps to take
back your property and ask you to live somewhere else.    I
hope this will be unnecessary for we want to do the right
thing by you, but in return we must ask you to do the right
thing by us.
                         "Yours truly,
                    . . . . . . . . . . . . . . . . . . . . . . . . . . .
                              "Ass't Treas.,
GWK/LB.                       "Oakland Realty Co.
    "P. S. We shall expect to hear from you by not later than
Tuesday, November 30th."

    "Soon after the service of this notice Mr. Link moved
out of the house and into another house he had built
on lot 21.    The Diamond Crystal Salt Company took
possession of the house about December 1, 1920.    The
house was vacant for a time.    The Diamond Crystal
Salt Company made some repairs on the house and for
the past 13 months has rented it for $60 per month.
    "The first named suit in which Mr. Link is plaintiff
was started December 13, 1920.    The second suit in
which the Diamond Crystal Salt Company is plaintiff
was started October 10, 1921.
    "This house was built by the contractor on the order
of Mr. Link.    During part of the time the house was
under construction Mr. Link worked on the house for
the contractor.    Mr. Link purchased all lumber and
materials or had the foreman for the contractor order

them.   Mr. Link approved nearly all the bills for lumber and material.   The contractor worked under Mr. Link's direction.   The officials and employees of the Diamond Crystal Salt Company had no control whatever and assumed none over the men engaged in construction work.   The company claims that what it did was to pay bills approved by Mr. Link.   It is undisputed that nearly all, if not all the material bills were approved by Mr. Link before they were paid by the Diamond Crystal Salt Company.   One of the officials of the company testifies that the contractor's bills for labor were also approved by Mr. Link before payment by the company, and handed to him after payment.   Mr. Link denied this.   From all the circumstances and from the course of handling the material bills, I am led to infer that Mr. Link had knowledge of the amount of each bill of the contractor about the time it was paid or soon thereafter.

"The house cost a larger sum than anyone contemplated it would before it was constructed.   It was built at a time when the highest prices had to be paid for labor and material.

"On September 2, 1919, at the request of Mr. Link the Diamond Crystal Salt Company conveyed lot 18 to James B. Murphy and on August 21, 1920 the company conveyed lot 21 to Mr. Link.   These two lots were fully paid for by Mr. Link.   Mr. Link now offers to pay for all the other lots if deeded to him, except lot 22 on which the house was constructed.   The testimony shows that all the lots which Mr. Link contracted to purchase have materially appreciated in value since the date of the contracts.   At the time these contracts were entered into Mr. Link was earning about $2,000 per year.   He has made sufficient tender to the officials of the Diamond Crystal Salt Company of the balance due on lot 17 and has asked for a deed of this lot.

"LAW.

"It has frequently been held that the jurisdiction of a court of equity to decree specific performance of contracts is not a matter of right in the parties to be demanded *ex debito justitiæ,* but applications invoking this power of the court are addressed to its sound and reasonable discretion, and are granted or rejected according to the circumstances of each case.   Specific performance is frequently refused, although the de-

fense is not such as would warrant the rescission of the contract at the suit of the defendant. *Solomon* v. *Shewitz,* 185 Mich. 620.

"The specific performance of a contract for the purchase of real estate may not be arbitrarily refused, but in the exercise of a sound legal discretion should be granted, in the absence of some showing that to do so would be inequitable. *Hager* v. *Rey,* 209 Mich. 194.

"From this record I am forced to conclude that to compel the Diamond Crystal Salt Company to convey lot 17 alone or to convey lots 16, 17, 19 and 20 and leave out lot 22 would be inequitable. The maxim, 'He who seeks equity must do equity' applies with peculiar force to this situation. The Diamond Crystal Salt Company has established the payment of $6,177.30 for the work, labor and materials that went into the house on lot 22, which bills were incurred by Link. The relation between the Diamond Crystal Salt Company and Mr. Link was only an ordinary business relation, not that of guardian and ward or of trustee and *cestui que trust.* Mr. Link built such a house as he desired and the Diamond Crystal Salt Company paid for it. It is true that this house cost more than any of the parties expected it would, but it does not appear that anyone except Mr. Link is to blame for this.

"Neither can it be said that by the service of the paper heretofore quoted on Mr. Link on November 23, 1920, the company elected to forfeit the contract on lot 22. This is not a legal notice of forfeiture but rather a letter written to encourage Mr. Link to fulfil his contract and containing a threat of a possessory action in case of Mr. Link's failure to do so.

"A decree or decrees, if two are necessary, may be entered providing for the specific performance of the contracts for lots 16, 17, 19, 20 and 22, the amount due on lot 22 to include the cost of the house. If this record fails to establish with sufficient certainty the sum due and the parties can not agree on this sum, additional testimony may be taken at the time of the settlement of the decree or decrees. The Diamond Crystal Salt Company to be allowed costs in the first suit against Mr. Link but no costs in the second suit; defendant Frank Benedict to be allowed costs in the

suit in which he is made defendant and the suit dismissed as to him for the evidence fails to show any reason for bringing an action against him.

"EUGENE F. LAW,<br>"Circuit Judge.

"Dated July 15, 1922."

A decree was later entered containing the following provisions:

"That the defendant do make, execute and deliver to the said complainant a good and sufficient deed of conveyance of lots 16, 17, 19, 20 and 22, of the Oakland Grove subdivision of a part of the city of St. Clair, Michigan, upon the tender to it of the balance due upon said lots, or $270, with interest amounting to $72.56, together with $6,177.30, the amount paid out by defendant on plaintiff's order for the erection of a house on said lot 22, less $100 rebate on the purchase price of lot 22 by reason of the fact of the said Link having built said house, or a total of $6,519.86, the said sum of $6,177.30 being hereby declared due because of the refusal and neglect of the plaintiff to properly execute the proposed contract and keep up the payments thereon. * * *

"That in the event that plaintiff fails to make a tender of the balance due as stated in paragraph one above, within 90 days from the entry of this decree, then the said defendant shall have execution against said plaintiff for the sum of $6,519.86 the balance of the purchase money found due with interest and the sum paid by defendant upon plaintiff's order for the construction of the house, and for said costs to be taxed as aforesaid according to the course and practice of this court.

"That pending the making of the tender by plaintiff or the issuance of the execution as aforesaid, the said sum of $6,519.86, is made a lien on the interests of the plaintiff on said lots 16, 17, 19, 20 and 22.

"EUGENE F. LAW,<br>"Circuit Judge."

The case is brought into this court by appeal.

The important contention of the appellant is stated as follows:

"Plaintiff contends there is no warrant in law for treating several distinct contracts as one, and denying the enforcement of one unless all are carried out at the same time.

"There is no pretense that there was any writing charging lot 17, for which a deed is sought in this suit, with any obligation toward the building of a house on lot 22.

"The statute of frauds requires a charge of that character to be in writing and signed by the party charged.    3 Comp. Laws, 1915, § 11975.

"Legal rights are as safe in chancery as they are at law.    21 C. J. p. 196."

This contention would undoubtedly be true if that was all there is of the case, but the court found, and we think he was justified in finding, that later than the written contracts, an oral contract was made which contract has been fully performed by the Diamond Crystal Salt Company.    It is true there is a sharp conflict between the testimony offered on the part of the respective parties.    It is also true that the hearing in this court is *de novo*.    It is likewise true that in case of a conflict in the testimony of witnesses, it is a great advantage in deciding who of them to believe, to see and hear them.    This advantage was possessed by the trial judge.    Some of the cases, as to this phase of the case, are *Bigbee* v. *Bigbee,* 50 Mich. 467; *Birdsall* v. *Birdsall,* 118 Mich. 658; *Frisbee* v. *Stewart,* 122 Mich. 538; *Wolff* v. *National Bank,* 131 Mich. 634.

Mr. Link claims that the house was to be built for $4,000, and that he should not be required to pay in excess of $6,000.    Some of his testimony on cross-examination is illuminating.    We quote:

"*Q.* You employed Mr. O'Sullivan to build this house?

"*A.* Yes.

"*Q.* He got his money from the Diamond Crystal Salt Company upon your O. K. of the bills?

"*A.* I did not O. K. no bills for Mr. O'Sullivan.

"*Q.* You authorized the Diamond Crystal to pay it?

"*A.* Yes.

"*Q.* And the bills of the material men you O. K.'d?

"*A.* Yes.   The house was built according to our plans.

"*Q.* While the contractor was building the house you worked for him right along on the house?

"*A.* Not every day, when the coal boats were in I was off days.   When the coal boats were not there I worked for O'Sullivan.   I put in cement and helped carry tile and laid floors.

"*Q.* From the beginning of the house to the end you were right there helping in its construction?

"*A.* Yes."

Not only did the trial judge possess the advantage of seeing and hearing the witnesses, but the probabilities are to be considered and weighed.   Is it probable that the Diamond Crystal Salt Company would agree to authorize an employee to make contracts for labor and material and pay for the same to such a large amount as that involved here upon so small a margin of security as the small payment which Mr. Link had made on lot 22?   We think this question must be answered in the negative.   *Salisbury* v. *Salisbury,* 49 Mich. 306.

It has long been a rule of this court that one who comes into the equity court must be prepared to do equity.   *Goodenow* v. *Curtis,* 33 Mich. 505; *Toms* v. *Boyes,* 59 Mich. 386; *Miller* v. *Cornwell,* 71 Mich. 270; *Northern Michigan Building & Loan Ass'n* v. *Fors,* 190 Mich. 69; *Innis* v. *Heft,* 217 Mich. 47.

The witnesses are all agreed that the vacant lots are now worth $600 each, and upwards.   As we have already seen Mr. Link is objecting to paying as he agreed to do for the house on lot 22, because it is not worth what it cost.   A statement of the above situation makes clear the inequity of the relief sought by Mr. Link.

The other questions raised by counsel have been considered, but do not need to be discussed.

There is one phase of the decree that we think should be modified. The understanding upon which both parties acted was in substance that defendant should finance plaintiff to the extent of $4,000, and that payment might be made "in such monthly or semi-monthly payments as will repay the entire amount so advanced in 10 years."

The decree should be modified so that this understanding may be carried out. When this is modified the decree will be affirmed, but without costs to either party.

CLARK, C. J., and McDONALD, BIRD, SHARPE, STEERE, FELLOWS, and WIEST, JJ., concurred.