**COKER et al. v. BENJAMIN et ux.**

No. 2729.

Court of Civil Appeals of Texas. Beaumont.
April 4, 1935.

Coker, Rhea & Vickrey, of Dallas,. for appellants.

Baker, Botts, Andrews & Wharton, of Houston, for appellees.

WALKER, Chief Justice.

On April 22, 1932, appellees, Fred W. Benjamin and wife, as lessors, for a valuable consideration executed an oil and gas lease to P. L. Tomer and A. F. Purdy, granting to lessees for the purposes of the lease 540 acres of land in Polk county for a term of 5 years and as long thereafter as gas and oil could be produced. One of the conditions of this lease was as follows: "If drilling operations are not commenced on said land on or before six months from this date, this lease shall then terminate as to both parties, unless lessee shall pay or tender to lessor or to the credit of lessor in Mitchell National Bank at Mitchell, So. Dak., (which bank is lessor's agent) the sum of Four Hundred Five 00-100 ($405.-00) Dollars (hereinafter called 'rental'), which shall extend for six months the time within which drilling operations may be commenced. Thereafter, semi-annually, in like manner, and upon like payments or tenders, the commencement of drilling operations may be further deferred for periods of six months during the primary term."

The lease also provided that the rights of each party could be assigned in whole or in part and that the provisions of the lease should extend to the assignee. On the 17th day of May, 1932, Tomer and Purdy assigned the lease to John W. Greer, who, on November 21, 1932, assigned 25 acres of the leased premises to appellant J. H.

Coker and on November 23, 1932, assigned to Coker and appellant J. A. Humphrey jointly 75 acres of the leased premises; this last lease was accepted by the assignees with the understanding between themselves that they should be equally interested in both the 25 acres and the 75 acres. When the assignment was made to Coker of the 25 acres and to Coker and Humphrey jointly of the 75 acres, all delay rentals against both the 25 acres and the 75 acres had been paid up to April 22, 1933. Under an agreement between Coker and Humphrey, Coker wired from Hot Springs, Ark., to appellee Fred W. Benjamin, c/o Mitchell National Bank, Mitchell, S. D., the sum of $100 by a telegram reading in part as follows:

"To pay lease rentals on twenty five acres J. H. Coker and seventy five acres J. A. Humphrey, Polk County, Texas. Please send receipt."

"Signature: J. H. Coker,
"Sender's Address: 322 Arlington."

Though the lease under which they held required appellants to make semiannual payments of 75 cents per acre, they were ignorant of that fact and thought the lease required annual payments of $1 per acre, and the $100 was wired appellee by appellants on their belief that this sum would pay the delay rentals up to April 22, 1934. The bank, as the agent of appellees, duly received the remittance and appellants' telegram. The remittance was deposited to appellees' credit prior to April 21, 1933, and the bank forwarded to appellees deposit slip showing the payment of $100, with copy of appellants' telegram which was received by appellee Benjamin about the 1st day of May, 1933. Appellees made no effort to return to appellants the excess payment of $25, nor did they send them a receipt for the $100, but retained it in their possession and made no offer to return it to appellants until after the next semiannual pay date. The bank had appellant Coker's address, which was also shown in the recorded assignment to Coker of his interest in the lease. Appellants failed to pay or to make tender of payment of the next semiannual rental installment maturing on the 22d of October, 1933. Appellees claim that the failure to make this payment terminated the lease to the extent of appellants' interest and filed and duly recorded their affidavit to that effect. Subsequently appellants made tender of the past-due rental and when the tender was refused filed this suit against

appellees on the 6th day of January, 1934, praying for judgment quieting them in the title and possession of their claimed leased interest, the removal of the cloud cast upon the title by the adverse claim of appellees, and for general relief. In a general way appellants pleaded the facts as we have enumerated them and the theory of their petition was that appellees had caused or had contributed to cause the mistake made by them in overlooking and failing to make the rental payment due on October 22d and were thereby estopped to claim that the lease had terminated. The answer of appellees put in issue all allegations of appellants' petition. On trial to the court without a jury judgment was entered that appellants take nothing by their suit as against appellees and that appellees go hence without day and recover of appellants all costs in this behalf expended; conclusions of law and fact were not filed, nor were they requested.

Appellants present their appeal on three propositions. The first two are as follows:

"1. It appearing from the undisputed evidence that on October 22, 1933, the plaintiffs were laboring under the mistake of fact that all rentals on the leases in question were paid to April 22, 1934; that at such time the defendants knew or ought to have known of such mistake on the part of plaintiffs; that such mistake was occasioned or brought about by the wrongful conduct of the defendants in failing to receipt plaintiffs for the payment made them by plaintiffs on April 22, 1933, in failing to advise plaintiffs of the overpayment made on such date, in failing to return to plaintiffs and retaining in their possession such excess payment, the legal duty being upon defendants to return such overpayment, the defendants are estopped to assert that the leases involved terminated on October 22, 1933, by reason of the non-payment of such rentals.

"2. It appearing from the undisputed evidence that on October 22, 1933, the date the delay rentals in question in the amount of Seventy Five ($75.00) Dollars were payable, prior thereto and thereafter, the defendants had in their possession the sum of Twenty Five ($25.00) Dollars tendered and paid to them as rentals on the leases in question; that they continued to accept and retain such sum without ever even tendering its return until subsequent to the filing of this lawsuit, the defendants waived the payment to them by plaintiffs of any further rental which might

have become due on October 22, 1933, and/or were estopped to demand payment of any additional sum to prevent termination of such leases."

These propositions present the issues of "estoppel" and "waiver," on the record purely fact issues. As a correct summary of the facts, we take the following statement from appellees' brief, questions and answers reduced to narrative:

"Mr. Coker testified that he had been buying and selling leases and taking assignments of leases for many years and that he had been engaged exclusively in that business since 1920. He further stated that he had been authorized by Mr. Humphrey to attend to the matter of paying the rentals under both assignments and that while he resided at Dallas, Texas, on April 17, 1933, he was at Hot Springs, Arkansas, on account of his health. He testified to having made the remittance of the $100.00 by telegraph as set out in appellants' brief.

"Mr. Coker further testified that when he purchased the assignment of the 25 acres he was represented by Mr. Grubb, his agent, who checked the records and obtained information as to the lease by appellees to Greer, from whom he took the assignment. He also testified as follows:

" 'Mr. Humphrey had a copy; he had a copy of the original lease. As a matter of fact, the photostatic copy of the original lease was in my file in Dallas. I got it in connection with the purchase of the seventy-five acres. I had it in my possession; that was before I ever went to Hot Springs. It turns out that that lease, on its face, provides for seventy-five cents rental semi-annually.'

"In connection with the remittance which he made from Hot Springs by telegraph, and as touching his lack of diligence in following up the remittance and obtaining a receipt, he testified as follows:

" 'I was at Hot Springs some two weeks after that. I didn't get any acknowledgment from the bank of that remittance. I don't know that I knew that they had received it. I was very sick there. And perhaps, I may have gotten some notice through the Western Union. I could have. But so far as I now recollect, until the time that I met Mr. Benjamin I didn't know that the bank had received the money at all. I don't think I wrote the bank to determine whether they had received the money. I waited more than six months; I was under the impression the money was paid. It is customary for banks to acknowledge receipt of money. It would have been a good precautionary method for me to have inquired; but nothing of that kind was done; banks of this country all acknowledge receipts of my money. That bank didn't do it.'

"Mr. Coker testified that after buying the 25 acres in his own right, he and Mr. Humphrey purchased jointly the 75 acres, he taking one-third and Mr. Humphreys taking two-thirds, and that in this way they acquired jointly an equal interest in the one hundred acres. In this connection Mr. Humphreys testified as follows:

" 'I went to Mr. Coker's room in the Texas State Hotel and said that I had agreed to buy seventy-five acres, and I asked him if he wanted to take a third with me and pool it together and make it undivided, and he said he would, and I said instead of drawing that to me to make a third interest to Coker and two-thirds to myself, which he did.'

"Mr. Humphrey testified to having turned over all papers in connection with the assignment of the 75 acres to Mr. Coker and having intrusted to Mr. Coker the matter of paying rentals. He had been in the business of buying and selling leases since 1921.

"Fred W. Benjamin testified that he was in the hospital in Chicago on April 22, 1933. He testified to having received from the bank at Mitchell, South Dakota, a copy of the telegraphic communication and a credit memorandum showing payment of the $100.00, which papers were received by him about May 1, 1933. After leaving Chicago Mr. Benjamin went to other places and then came to Livingston, and he had not visited Mitchell, South Dakota, since having received the communication mentioned. He further testified as follows:

" 'At the time I received this data that has been offered in evidence, information that there had been deposited this sum of one hundred dollars I did not know Mr. J. H. Coker; I did not know Mr. J. A. Humphrey. I did not know the address of either of them; I had no information relative to that. I did not know why that remittance had been made for one hundred dollars instead of seventy-five dollars; we were in the dark as to the twenty-five dollars. Some time before—I should say perhaps January—we had re-

ceived word from J. W. Greer of Houston, who had taken over the 540 acre tract from Toner and Purdy, that he felt there was more than 540 acres in the tract that he had taken over, and he advised me to have that tract surveyed, because I would find more acreage than the deed called for. * * * We were laboring under the impression that the twenty-five dollars was an overpayment on overacreage, and if it wasn't of that nature we would be informed by the men who were rendering the acreage. I never got any information from Mr. Coker or Mr. Humphrey as to why they made the twenty-five dollars additional payment; all the information I had was the telegram. There was no additional payment made on October 22, 1933. On December 8th I made and filed my affidavit claiming forfeiture of the lease; I waited that long for some probable adjustment or suggestion, and then I filed my affidavit together with the banker's. After October 22, 1933, we had opportunities to sell leases on this land or had an offer for leases on the land. We were offered one hundred dollars and entered into a contract with the Bay Oil Company of Tulsa, Oklahoma, O. B. Levin, President, for the seventy-five acres at one hundred dollars per acre, and we sold the royalty beside, too. That is aside. Those contracts were never carried out by them. * * * That offer made by the Bay Oil Company to take the lease was not performed by them. I later had a contract with the Atlantic Oil Producing Company, and they also declined to take it. I have a letter from Mr. Coolige to the effect that the lease was not closed because of the cloud of the Coker and Humphrey * * * the claim they were asserting. They were to pay me one hundred dollars per acre for the lease. I have always been ready and willing to refund the twenty-five dollars, and offer it to these gentlemen, that was overpaid. * * *

"I did not at any time after the receipt of that telegram undertake to locate either Mr. Coker or Mr. Humphrey; I assumed that the lessee was under obligation to do that. I didn't undertake to locate either Mr. Coker or Mr. Humphrey. I was not apprised by this telegram of Mr. Coker's address. The address wasn't on the bottom of it; not on the telegram that I got; that is all I got. I didn't ask the bank at Mitchell, South Dakota, whether or not they had any address for Mr. Coker and Mr. Humphrey; if you will let me explain why I will—well, the usual form of receipt I have received from the oil companies, which I signed and returned —I got no receipt, no address, had no information other than the telegram from Coker and Humphrey."

Where trial is had to the court without a jury and no conclusions of law and fact are filed nor requested, on appeal every conclusion of fact must be indulged in support of the judgment that has support in the pleadings and the evidence; and the judgment will be affirmed if it has support in any reasonable construction of the pleadings and evidence. Cisco & N. E. Railway Co. v. Texas Pipeline Co. (Tex. Civ. App.) 240 S. W. 990; 1 Tex. and S. W. Dig., Appeal and Error, ☞934 (1). The evidence as summarized will support the following conclusions: First. Though appellants did not in fact know the terms of the rental conditions of their lease, they had a copy of the original lease made by appellees to Tomer and Purdy in their possession. They were experienced in dealing in leases. Appellants' mistake in making the remittance of $100 for the rental maturing on the 22d of April, 1933, and in not remitting for the rental maturing on October 22, 1933, resulted solely and alone from their own negligence. Second. Appellees neither caused appellants' mistake nor contributed to their mistake in making the remittance of $100 in April, 1933, and in not paying the rental due in October, 1933. When appellees received the remittance, they did not know that it had been made under a mistake. Though they did not send appellants a receipt for the $100, no receipt was requested except in the telegram remitting the $100. Though they did not return nor offer to return the $25 until after the lease had terminated by its terms, they retained this excess payment, believing that it was in payment of excess acreage. It never occurred to appellees, in receiving the $100 payment, that appellants had made a mistake by sending $100 instead of $75. Appellee Benjamin was an old man in a Chicago, Ill., hospital when he received the remittance. He did not know, prior to receiving the remittance, of the assignments to appellants; he had the right to assume, as he did assume, that appellants were familiar with the terms of the original lease, and that they were acting advisedly in remitting the $100. These facts are sufficient to support the conclusion that

appellees did not cause the mistake of appellants and in no way contributed to their mistake.

■■ The law of the first conclusion of fact, supra, is that "equity will not relieve a person from his erroneous acts or omissions resulting from his own negligence." Pomeroy's Equity Jurisprudence, vol. 2, p. 1476. In American Maid Flour Mills v. Lucia (Tex. Civ. App.) 285 S. W. 641, 643, the court said: "A mistake of fact to warrant a ground for equitable relief must not arise from want of proper care. * * * Relief will not be given for mistake resulting from negligence of the party seeking relief. * * * Though a court of equity will relieve against mistake, it will not assist a man whose condition is attributable only to the want of due diligence which may be fairly expected from a reasonable person." In Stern v. Maxwell (Tex. Civ. App.) 44 S.W.(2d) 482, the court said: "It is a quite settled principle that the assignee of a lease conveyed by assignment is liable for the rental, and of this, as a matter of pure law, he could not be ignorant, * * * to avoid consequences of failure of payment of money strictly in point of time, it seems imperative that the circumstances must exclude the idea that neglect or carelessness prevented a compliance or that it has been occasioned by the fault of the other party."

Conclusion of fact No. 1 within itself is sufficient to support the judgment of the trial court.

The law of the second conclusion of fact also supports the judgment. In Empire Gas & Fuel Co. v. Saunders (C. C. A.) 22 F.(2d) 733, 735, appellants contended that "Saunders and the bank, his agent, had knowledge that the Empire Company had made a mistake in the amount of its check in time to give notice before the December installment of rent was due, and by their silence misled the Empire Company into believing that the rental had been paid in full"; the very contention now before us. In answering that contention, the court said: "The lease under consideration provides that, if drilling is not begun within one year from its date, the rights of the lessee shall terminate, unless the lessee keeps it alive by making the payments of rent. It makes time the essence of the contract. The lessee is not obligated to do anything, but, if it fails either to drill wells or to make the payments of rent as and

when due, its rights and privileges are at an end. The lessor was under no duty to notify the lessee of a failure to pay the correct amount due as rent, and had the right to remain silent. Under these circumstances, the lessee could not rely on the lessor's silence." ·

A similar contention was made, without support in the law, in Stern v. Maxwell, supra. In LeRosen v. North Central Texas Oil Company, 169 La. 973, 126 So. 442, 443, the lease provided for a deposit of rentals in the bank to the credit of the lessor, a married man. The rentals were deposited to the joint account of the lessor and his wife. The lessor remained silent, although he had knowledge that the lessee believed that the rentals were payable to lessor and his wife jointly. Discussing the law of these facts, the court said:

"We fail to see any room for the application of the plea of estoppel, the second ground of defense. It was defendant's duty to comply with the agreement in order to obtain its enforcement. Defendant could not omit to comply with its contract, relying upon notice from the plaintiff to enable it to supply the omission.

"There is no suggestion that plaintiff did anything whatever to induce the defendant to make the deposit to the joint account of his wife and himself. Defendant was as well informed as plaintiff was of the condition under which its option could be extended. There was no legal duty resting upon plaintiff to advise defendant that it had failed to comply with the condition; its failure to do so not being in any wise attributable to plaintiff."

On the issue of estoppel by failure to speak, in Holland v. Blanchard (Tex. Civ. App.) 262 S. W. 97, 102, the court said:

"To successfully urge the defense of estoppel in pais, the party relying on the defense must not only be ignorant of the truth, but must have been destitute of any convenient and available means of acquiring a knowledge of the truth.

"In the case of Sheffield Car Co. v. Constantine Hydraulic Co., reported in 171 Mich. 423, 137 N. W. 305, Ann. Cas. 1914B [984], 994, 995, the court said:

" 'It may be stated as a general rule that it is essential to the application of the principle of equitable estoppel that the party claiming to have been influenced by the conduct or declarations of another, to his injury, was himself not only destitute of

knowledge of the state of the facts, but was also destitute of any convenient and available means of acquiring such knowledge; and that, where the facts are known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel.'"

For additional authorities, see 17 Tex. Jur. 143; Cox v. Simmerman, 243 Ky. 474, 48 S.W.(2d) 1078; 21 C. J. 1150; Abell v. Bishop, 86 Mont. 478, 284 P. 525; Taylor v. Hamilton, 194 Cal. 768, 230 P. 656; Lord Construction Co. v. Edison Portland Cement Co., 234 N. Y. 411, 138 N. E. 39. The law announced by the cited cases would support the conclusion that appellees did not cause appellants' mistake nor contribute thereto, even had the evidence shown that they knew of the mistake. However, the evidence raised the issue, which is found in appellees' favor in support of their judgment, that they did not know of the mistake and had a reasonable basis in fact for retaining the excess payment of $25.

Appellants' third proposition is as follows: "3. It appearing from the undisputed evidence that, on October 22, 1933, the date the delay rental in question was payable, the defendants had in their possession the sum of Twenty Five ($25.00) Dollars tendered and paid to them by J. H. Coker 'to pay rentals on twenty five acres J. H. Coker and seventy five acres J. A. Humphrey, Polk County, Texas,' that under the lease payment could be made on either of the tracts independently of the other, and that such sum was more than sufficient to pay the rentals on the 25-acre tract, the law would apply such sum to the payment of the rental due on the 25-acre tract, and the same was therefore, at all times, fully paid."

We also take the facts of this proposition from appellees' brief:

"Both Mr. Coker and Mr. Humphrey thought that the full $100.00 was due April 22, 1933. When they ascertained the actual rental called for in the lease neither of them requested that the $25.00 excess be applied on the 25 acres standing in Mr. Coker's name, nor did they differentiate in any way between that acreage and the 75 acres. On the other hand they refused to acknowledge that the lease on any of the acreage had terminated and on December 10, 1933, they tendered to Mr. Benjamin $50.00 as the balance due on the 100 acres. In paragraph X of their orig-inal pleading appellants again tendered $50.00 and they paid $50.00 into the registry of the court. They testified:

"Mr. Coker:

"'The first time that I learned of my mistake in the provisions of the lease with reference to delay rentals it was some time—the first part of December of 1933. The way I learned that fact was a man by the name of Smith, representing someone in Tulsa, came up to see Mr. Humphrey and myself and talked to Mr. Humphrey first, I believe. They came to my office and he said that Mr. Benjamin had filed an affidavit, or something to that effect, saying that this lease was forfeited, and he wanted to know if we would ratify a new lease from Mr. Benjamin to them. That was my first information of it. Immediately after that Mr. Humphrey and myself came down here to see Mr. Benjamin about it. * * *

"'We met Mr. Benjamin in Mr. Jones' office on Friday, I believe, and discussed the matter with him and tendered the rental; that is, twenty-five cents per acre, I guess; whatever was due; and talked to him at length about it to see if we could not get it adjusted satisfactorily.'

"Mr. Humphrey:

"'As to whether I had occasion to say anything further in connection with these leases at that time,—no sir, the only thing that I knew of it later on (after the $100 had been wired on April 17, 1933), was, as Mr. Coker stated, this Mr. Smith came to see me in Dallas, and said he expected to purchase or was agreeing to purchase from Mr. Benjamin the seventy-five acres—of this particular seventy-five acre tract, and wanted to know if I would ratify the lease or what would we take for the lease, and I said I didn't want to sell it, but I would see Mr. Coker, and that we didn't know anything about the rental not being paid on it. I believe I got Mr. Coker and we went to the Dolphus Hotel. This was noon time and I think we came the same afternoon and talked to Mr. Benjamin in Jones and Jones' office.

"'* * * At that time we offered to pay to Mr. Benjamin any rentals that might be due; Mr. Coker offered to do that.

"'* * * Mr. Smith didn't say who it was he was representing; he said he was handling the transaction for people in Tulsa. And he wanted me to release it or

ratify that lease. I don't know whether he told me they were paying one hundred dollars an acre or not, but I know that was the consideration. I declined to give the release or ratify this transaction. On October 22, 1933, no additional tender was made to pay the rentals for the next six months' period because we were under the impression it was annual rental.'

"Appellees received only $405.00 from an oil and gas lease of 540 acres. * * * Shortly after October 22, 1933, the date on which appellants' lease expired by its own terms for non-payment of the rental, it was worth $100.00 per acre. At that time Mr. Dick Schwabb was drilling a well in the vicinity of the land in question and both of the appellants were well acquainted with that fact."

▮ The application of payments by the court, where payment has not been directed, is to effectuate the intention of the parties; "when their intention can be determined with reasonable certainty, an undirected payment will be applied accordingly." 32 Tex. Jur. 683. Again in 48 C. J. 654 it is said: "Payments by the debtor will be applied according to the intention of the parties where that can be determined with reasonable certainty. * * *"

The facts raised the issue for the court —if it can be said that the issue was not established as a matter of law—that appellants in making the payment had no "intention" that the payment of $25 should be applied to any part of the leased premises. The payment of $100 was made under a mistake and was due solely to appellants' own want of care. Appellees received the payment in good faith and retained it in good faith, believing, as stated above, that the excess payment was for excess acreage, which, on their statement of the facts, was a reasonable belief.

The issue was raised against appellants that they did not intend that the excess payment should be applied to the 25 acres. When the mistake was first discovered, they made no such request, but attempted to apply the excess to the October rental and sought to compel appellees to give them a credit to that effect.

As stating appellants' contention in the lower court in relation to the excess payment, we quote as follows from appellees' summary of the pleading on that issue:

"Appellants' pleading does not attempt to set forth a cause of action for any specific relief with reference to any particular part of the 100 acres as distinguished from all of it.".

If appellants ever had the right to direct application of the $25 excess payment, they lost it by their assertion of an inconsistent right. In adjudicating the rights of a party who had made a choice between two inconsistent remedies, it was said in Providence-Washington Ins. Co. v. Boatner (Tex. Civ. App.) 225 S. W. 1115, 1117, affirmed Boatner v. Ins. Co. (Tex. Com. App.) 241 S. W. 136: "He has selected his battle ground; he has elected his course of action and his remedy, and must suffer the results of the overinsurance. Grizzard v. Fite, 137 Tenn. 103, 191 S. W. [969], 970, L. R. A. 1917D, 652; Jirou v. Jirou [Tex. Civ. App.] 136 S. W. [493], 498; Whitney v. Parish of Vernon [Tex. Civ. App.] 154 S. W. 264; Stinson v. Sneed [Tex. Civ. App.] 163 S. W. [989], 991; Clemenger v. Flesher [Tex. Civ. App.] 185 S. W. 304; McPherson v. Camden Fire Ins. Co. [Tex. Com. App.] 222 S. W. 211."

It follows that the judgment of the lower court should be in all things affirmed and it is accordingly so ordered.

Affirmed.